THOMAS R. BURKE (SBN 141930)
JEFF GLASSER (SBN 252596)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111-6533
Telephone: 415.276.6500
Facsimile: 415.276.6599
thomasburke@dwt.com

ROBIN L. GOLDFADEN (SBN 208055)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
   OF THE SAN FRANCISCO BAY AREA
131 Steuart Street, Suite 400
San Francisco, CA 94105
Telephone: 415.543.9444 ext. 201
Facsimile: 415.543.0296
rgoldfaden@lccr.com

*Attorneys for Plaintiff Jeffrey Martins*

ORIGINAL
FILED

FEB 11 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

LB

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFFREY MARTINS,<br><br>       Plaintiff,<br><br>    v.<br><br>UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, an agency of the United States Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, in his official capacity as Director of United States Citizenship and Immigration Services; JANET NAPOLITANO, in her official capacity as Secretary of the Department of Homeland Security,<br><br>       Defendants. | C Case No. 13 0591<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FOR VIOLATION OF THE FREEDOM OF INFORMATION ACT, 5 U.S.C. § 552 et seq., AND THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 701 et seq.** |

DAVIS WRIGHT TREMAINE LLP

1

## Introduction

1. Plaintiff Jeffrey Martins brings this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 *et seq.*, as amended, and the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*, to enforce the right of asylum seekers and those who represent them to have access to the notes taken by Asylum Officers to document the content of asylum interviews. Plaintiff is an immigration attorney whose practice includes a focus on representation of asylum seekers. In addition to representing clients directly, Plaintiff assists an even greater number of asylum-seeking individuals and families by serving as a volunteer mentor to pro bono attorneys representing indigent applicants for asylum through a program at the Lawyers' Committee for Civil Rights of the San Francisco Bay Area. With this action, Plaintiff seeks to remove a substantial impediment to the provision of full and effective legal representation for asylum seekers who must renew their applications before the Immigration Court. Plaintiff also seeks to assist the vast numbers of individuals who must proceed without the benefit of counsel when renewing their asylum applications before the Immigration Court.

2. Asylum seekers whose applications are first evaluated by the Asylum Office have an interview before an Asylum Officer. Applicants' responses to the questions asked during these interviews become part of the evidentiary record upon which the Asylum Office's adjudication of the application is based. These interviews are not recorded, nor are they transcribed by a court reporter. Instead, the interviewing Officers are charged with taking accurate notes in a manner that is sufficiently thorough and detailed to reflect what transpired during the interview and to thereby allow the reader of the notes to reconstruct the interview. Officers are instructed that their notes should form an objective record of the interview and not include subjective thoughts or impressions. The latter are instead included in a separate document, referred to as the "assessment," in which Officers provide their evaluation, analysis, and recommendations.

3. In a substantial number of cases, asylum is not granted at the Asylum Office and the applicant is referred for removal proceedings before the Immigration Court, where the individual can seek asylum anew. For attorneys representing these individuals, the Asylum Officer interview notes can be an indispensable tool for ensuring the best possible preparation of clients' cases at the

COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF

DAVIS WRIGHT TREMAINE LLP

Immigration Court. Without the notes, Plaintiff and attorneys like him face a significant obstacle to providing full and effective representation. The problems are particularly heightened for cases in which Plaintiff did not previously represent a client who applied for asylum and attended the asylum interview unaccompanied by any legal representative.

4. For years, as a regular part of his practice and with his clients' consent, Plaintiff has submitted requests under the Freedom of Information Act to U.S. Citizenship and Immigration Services (USCIS), a component of the U.S. Department of Homeland Security (DHS), for production of the records that comprise his clients' "A-Files" (also known as Alien Files). A-Files are created and maintained by the government to document individuals' known immigration history, status, and related matters. Among the records sought by Plaintiff with these requests are Asylum Officers' interview notes, which are contained in the A-File of each individual who has applied for asylum and been interviewed by an Asylum Officer. Having these notes assists an attorney such as Plaintiff in representing clients with various immigration matters, including when the clients are in proceedings before the Immigration Court.

5. In the past, USCIS produced copies of the Asylum Officers' interview notes in response to FOIA requests for asylum applicants' A-Files. More recently, however, USCIS has had a pattern and practice of withholding these records in response to FOIA requests submitted by Plaintiff and others seeking the same type of records. Nothing about the nature of the notes has changed during or since the time when the agency shifted to withholding the notes, yet USCIS now has a policy of refusing to produce these records on the ground that they are covered by the "deliberative process" privilege and therefore exempt from FOIA under Exemption 5 of the statute, 5 U.S.C. § 552(b)(5), which protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."

6. Prior to instituting the challenged policy and practice, Defendants allowed government attorneys prosecuting removal cases before the Immigration Court to use the Asylum Officer interview notes and to introduce them *as evidence* in those proceedings. While now claiming the notes are exempt from production under FOIA, Defendants continue to allow their own attorneys,

at their choosing, to use the notes and submit them as evidence in Immigration Court cases. Then, and *only then*, *these same notes are made available* to the individual asylum seeker and his or her legal representative. By that point, however, the attorney's time and ability to consider the notes and factor them into the representation have been sharply curtailed. And the asylum seeker who is proceeding on his or her own is even less able to respond.

7. In sum, the nature, character, purpose, and use of the Asylum Officer interview notes have not changed, but by virtue of Defendants' unsupportable policy and practices, the playing field has become all the more uneven for asylum seekers who must fight for protection in Immigration Court. For his own practice and for his clients and those who are similarly impeded by Defendants' policy and practice of withholding Asylum Officers' notes of the interviews, Plaintiff brings the instant action to tilt the balance back toward fairness and enforce the right of access that the Freedom of Information Act was intended to ensure for records like those sought here.

## Jurisdiction and Venue

8. This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B). The Court also has subject matter jurisdiction under 5 U.S.C. § 702. Because this action arises under federal law against an agency of the United States, this Court additionally has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346.

9. The Court has jurisdiction to grant declaratory, injunctive, and further necessary and proper relief pursuant to 28 U.S.C. §§ 2201-2202 and Federal Rules of Civil Procedure 57 and 65.

10. Venue in this district is proper under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e). Plaintiff resides or has his principal place of business in this district.

## Parties

11. Plaintiff Jeffrey Martins is an attorney who resides in Alameda County, California, and whose principal place of business, the Law Office of Jeffrey Martins, is located at 369 Pine Street, Suite 725, San Francisco, California 94104. Mr. Martins has practiced in the area of immigration law for more than a decade. Earlier in his professional career, Mr. Martins was an Asylum Officer. He now regularly represents asylum seekers and other immigrants before the

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

1  Asylum Office, District Immigration Office, Immigration Court, Board of Immigration Appeals,

2  and U.S. Court of Appeals.  When representing clients before the Immigration Court and in other

3  matters, Mr. Martins routinely submits requests under the Freedom of Information Act (FOIA) to

4  the Defendant U.S. Department of Homeland Security and one or more of its constituent agencies,

5  including Defendant U.S. Citizenship and Immigration Services, for a given client's complete A-

6  File, which contains all DHS- and former-INS-generated records and documents pertaining to the

7  individual's immigration status and history.  These FOIA requests are made with the consent of

8  Mr. Martins's clients and on their behalf.  Requests made by Mr. Martins under the FOIA for

9  clients' A-Files have included those identified below with initials to protect confidentiality.  The

10  records that are the subject of these requests are needed to facilitate Mr. Martins's representation

11  of his clients.  Without certain of the documents, including the notes of clients' asylum interviews,

12  sought through these FOIA requests, Mr. Martins's ability to provide the best legal representation

13  possible is thwarted.  Mr. Martins will continue to submit FOIA requests for A-Files and seek

14  asylum interview notes in this manner as he takes on the representation of new clients.

15      12.  Defendant United States Citizenship and Immigration Services (USCIS) is the federal

16  agency that oversees lawful immigration to the United States.  USCIS is a component of

17  Defendant Department of Homeland Security and is responsible for certain immigration-related

18  adjudications and benefits programs.  Among the programs that USCIS administers are those that

19  are "humanitarian" in nature, providing protection to individuals inside and outside the United

20  States who are displaced by war, famine, and civil and political unrest, and those who are forced to

21  flee their countries to escape the risk of death and torture at the hands of persecutors.  This

22  includes administration of the Asylum Program.  Also part of USCIS is the National Records

23  Center (NRC).  In addition to fulfilling an internal record-keeping role for the agency, NRC is the

24  main office for the processing of FOIA requests directed to USCIS.

25      13.  Defendant Department of Homeland Security (DHS) was created through the

26  integration of all or part of 22 different federal departments and agencies into a unified, integrated

27  Department.  One of its components is USCIS.

28      14.  Defendant Alejandro Mayorkas is the Director of USCIS.  He is responsible for the

1  compliance of USCIS and the NRC with the laws of the United States, including the laws at issue
2  in this case.

3      15.  Defendant Janet Napolitano is the Secretary of the Department of Homeland Security.
4  She is responsible for the compliance of DHS and its component agencies with the laws of the
5  United States, including the laws at issue in this case.

6                              **Factual Background**

7      16.  Asylum is a form of protection for persons who have suffered persecution or have a
8  well-founded fear of persecution on account of race, religion, nationality, membership in a
9  particular social group, or political opinion.  In addition to ensuring that the person will not be
10 removed to the country where the harm was caused or is threatened, a grant of asylum gives the
11 individual legal immigration status in the United States.  The asylee receives authorization to work
12 and may also petition for legal immigrant status to be granted to his or her spouse and children.
13 One year after the grant, the asylee may apply to adjust his or her status to that of a lawful
14 permanent resident, and from there the individual can continue on a path to U.S. citizenship.
15 Asylum thus allows an individual who has faced great harm to start over, to heal, and to build a
16 life in a place that is safe from the threats that drove him or her to flee to the United States.

17     17.  A person who is not in removal proceedings may apply for asylum affirmatively, and
18 one who is in removal proceedings may apply as a defense to removal.  Affirmative asylum
19 seekers commence the application process by mailing a completed Form I-589 to one of four
20 USCIS Service Centers.  The application is then forwarded to the USCIS Asylum Office that has
21 jurisdiction over the case, and the applicant is scheduled to appear for an interview before an
22 Asylum Officer.

23     18.  An asylum applicant may appear for the interview on his or her own.  Alternatively, at
24 his or her own expense, an applicant may be represented in applying for asylum, including at the
25 interview before the Asylum Officer.  The applicant is responsible for bringing an interpreter to
26 the interview if one is needed.

27     19.  At the interview, the Asylum Officer reviews the application with the applicant and
28 questions the applicant under oath.  As a general matter, questions are used to elicit information

DAVIS WRIGHT TREMAINE LLP

bearing on the applicant's eligibility for asylum.  Some matters must be explored with every applicant -- factors related to the elements of the refugee definition, those related to mandatory bars and bases for discretionary denials, the applicant's current immigration status, and factors that relate to the one-year filing deadline.  Some questions will be essentially the same from applicant to applicant, such as whether the person has persecuted others or previously applied for asylum, while other questions probe the particular facts underlying the individual applicant's claim for asylum.  While conducting the interview, the Asylum Officer seeks to determine if the applicant is credible.

20.  Asylum interviews are not recorded.  The interviewing Asylum Officer is responsible for taking notes that document the interview.  If present, an attorney for the applicant may also take notes and retain his or her own notes.  An interpreter may also take notes in order to help him or her provide accurate interpretation, but these notes are confiscated at the end of the interview.

21.  Asylum Officers receive training and direction in how they are to take notes of asylum interviews.  The USCIS Asylum Division's Training Section provides training on a national level as well as on a local level in the field offices.  All Asylum Officers are required to attend and complete the Asylum Officer Basic Training Course (AOBTC), which is a national training course that is specific to asylum adjudications.  The Asylum Officer Basic Training Course lesson modules are used to train Asylum Officers at the mandatory 5-week AOBTC.  The lessons are updated as the need arises to address new case law, statutory requirements, and procedural directives.  These lessons are not only used for the instruction of newly-hired Asylum Officers, but are also used to articulate and communicate Asylum Division guidance on the substantive adjudication of asylum cases, and the lesson modules are also used as a reference tool for Asylum Officers as they perform their duties.

22.  One of the AOBTC lesson modules specifically addresses "Note-Taking" by interviewing Asylum Officers.  A copy of this lesson module, available on the USCIS website, is attached hereto as Exhibit A.

23.  The Note-Taking lesson module provides an overview of the purpose of the notes taken by the interviewing Asylum Officer, and it details the requirements and characteristics of

DAVIS WRIGHT TREMAINE LLP

"proper note-taking." The lesson module explains:

> It is essential for asylum officers to take clearly written and comprehensive notes during the interview. Interview notes must accurately reflect what transpired during the interview so that a reviewer can reconstruct the interview by reading the interview notes. In addition, the interview notes should substantiate the asylum officer's decision.

Exhibit A at 3.

24. While it is recognized that mistakes will occur, interviewing Asylum Officers are charged with taking notes that are clear, accurate, detailed, and objective. The lesson module repeatedly emphasizes that "[a] reviewer should be able to reconstruct what transpired during the interview by reading the interview notes." Exhibit A at 3, 5, 10. The Officers are not required to transcribe every word that is spoken during the interview, but they are instructed that their notes should accurately reflect what the Officer asks and what the applicant says and further that there can be instances when having the notes include every word is essential to capture the meaning of what the applicant has said. When appropriate, the Asylum Officer is also to note what an applicant does not say, such as when the applicant is not able to answer a question.

25. While documenting the content of the interview, the Officer's notes must not include his or her subjective opinions, suppositions, or personal inferences. The note-taking lesson module states:

> Asylum officers should take care that their notes will be perceived by others as an accurate and objective record of the interview. For example, even an exclamation point placed in reaction to a portion of the applicant's testimony may appear as a judgment of the applicant's claim.

Exhibit A at 5-6.

26. After the interview, separate and apart from the notes themselves, the Asylum Officer is responsible for completing an assessment of the asylum applicant's claim. The assessment provides the Officer's evaluation of the applicant's claim.

27. A supervisor reviews all of the evidence as well as the interviewing Officer's

DAVIS WRIGHT TREMAINE LLP

assessment before a decision on the application is made.  In some cases, additional review by Headquarters follows.  Thereafter, a given application may or may not be granted.

28.  If asylum is not granted to the affirmative asylum applicant and the applicant otherwise does not have valid immigration status in the United States, a Notice to Appear is issued to the asylum seeker and the individual is referred for removal proceedings at the Immigration Court.  The Referral Notice typically provides only minimal information about the basis or bases for the Asylum Office's decision not to grant asylum.

29.  Before the Immigration Court, the applicant, now formally referred to as the "respondent," can renew his or her application for asylum.  The Immigration Judge reviews the respondent's asylum case de novo.  However, the proceedings are now adversarial in nature, with the respondent's application contested by an attorney working for Immigration and Customs Enforcement (ICE), another component of the Defendant Department of Homeland Security.

30.  ICE Trial Attorneys prosecuting cases before the Immigration Court have access to a great deal of information about respondents, including each individual's A-File, which contains all official record material for a noncitizen for whom DHS or its predecessor agency has created a record under the Immigration and Nationality Act.  It includes all immigration-related documents such as previously submitted applications and petitions, naturalization certificates, documents related to removals from the United States, reports of investigations, statements, correspondence, and memoranda.

31.  Included among the documents contained in the A-File for an affirmative asylum applicant who is referred for Immigration Court proceedings are the Asylum Officer notes from the asylum interview and the Asylum Officer's assessment.  The government allows ICE Trial Attorneys to use the Asylum Officer interview notes as evidence in the removal proceedings.  In fact, the AOBTC Note-Taking lesson module specifically contemplates that "ICE Trial attorneys have access to the files of cases that are referred to the immigration judge or denied by the asylum officer.  If interview notes are introduced to the court as evidence, the immigration judge will also see the interview notes."  Exhibit A at 4.  In many cases, ICE Trial Attorneys will compare court testimony or prior written statements to the notes in an effort to identify inconsistencies, and they

DAVIS WRIGHT TREMAINE LLP

1   will use the notes to try to impeach the applicant's credibility.

2        32.  Repondents in Immigration Court have a right to due process and a right of access to

3   all records and documents that are not considered by the Attorney General to be confidential and

4   that pertain to the individual's admission or presence in the United States.

5        33.  The AOBTC "Note-Taking" lesson module expressly contemplates that individual

6   respondents and their representatives will be given a copy of the Asylum Officer notes if the

7   interview notes are introduced in proceedings before the Immigration Court.  Exhibit A at 4.

8        34.  In order to prepare their clients and present their cases in the strongest manner

9   possible, attorneys representing respondents before the Immigration Court will frequently submit

10  FOIA requests to USCIS for their clients' A-Files in advance of the individual merits hearings.

11  For asylum seekers and their representatives, a FOIA request for the A-File is often the fastest way

12  – and for many, the only practical way – to secure information from the A-File that is needed to

13  prepare sufficiently in advance of the merits hearing.  The notes can be needed for other

14  immigration matters as well, and again a FOIA request will be the most effective and possibly the

15  only means of securing these records.

16       35.  In representing an individual referred by the Asylum Office for proceedings before the

17  Immigration Court, having the notes from the individual's interview before an Asylum Officer can

18  be integral to the representation the attorney will seek to provide to his or her client.  The notes are

19  especially important to have when an attorney is representing an individual whom he or she did

20  not represent before the Asylum Office.

21       36.  By way of example, for clients he did not represent in the asylum interview, Plaintiff

22  Jeffrey Martins uses Asylum Officers' notes to identify ways in which clients did not effectively

23  communicate facts relevant to showing their eligibility for asylum.  He can then better prepare the

24  clients for their hearings and determine whether additional evidence should be presented in

25  support of the clients' claims.  With the notes, he can also identify when possible inconsistencies

26  may be emerging and can question the client to develop an understanding of what might explain

27  those perceived differences in the way the client has communicated his or her experience on

28  different occasions.  With the notes, Plaintiff can prepare his clients for the cross-examination they

DAVIS WRIGHT TREMAINE LLP

will likely face from the ICE Trial Attorneys. In addition, particularly where he was present for the client's interview, Plaintiff can assess whether the notes reflect a mistake or misunderstanding on the part of the interviewing Asylum Officer or simply a miscommunication between the Officer and the applicant or the interpreter.

37. Without the Asylum Officer's notes, Plaintiff often cannot provide the best representation possible for the client and in virtually all instances he cannot be certain that he is providing that maximum level of representation because he lacks key information.

38. In order to maximize the quality of representation he can provide his clients, Plaintiff Martins routinely submits FOIA requests for his clients' A-Files. In doing so, he seeks Asylum Officer interview notes for those referred by the Asylum Office for Immigration Court proceedings.

39. The AOBTC "Note-Taking" lesson module recognizes that Asylum Officer's notes will be produced in response to FOIA requests at least some portion of the time such requests are submitted. It states:

> Some asylum applicants or their representatives may obtain the notes as part of a Freedom of Information Act (FOIA) request. Although generally, notes are not provided in response to a FOIA request, there have been occasions when they have been provided.

Exhibit A at 4.

40. In the past, Mr. Martins frequently received the Asylum Officer interview notes when his clients' A-File contents were produced in response to the FOIA requests he filed as part of his representation of his clients. A sample of these notes, redacted by Plaintiff to protect the client's identity, is attached hereto as Exhibit B.

41. Beginning in or around March 2012, Plaintiff Martins stopped receiving the Asylum Officer notes of his clients' asylum interviews on a consistent basis despite his having requested them in the same manner as he previously had, through a FOIA request for the A-File. Over the past several months, none of Mr. Martins's requests under FOIA for his clients' A-Files has led to production of the notes taken during his clients' asylum interviews though he has repeatedly

DAVIS WRIGHT TREMAINE LLP

appealed to the agency and specifically challenged the withholding of asylum interview notes.

42. On information and belief, after regularly producing the notes in response to FOIA requests for years, USCIS changed course and as a matter of policy began refusing to release Asylum Officers' notes of their interviews of asylum applicants.

43. While USCIS has been withholding Asylum Officer notes when requested under FOIA, DHS continues to make the notes available to ICE Trial Attorneys and allows them to use them against affirmative asylum applicants who are referred for removal proceedings before the Immigration Court.

44. In circumstances in which notes from an individual's asylum interview are introduced as evidence by an ICE Trial Attorney, the respondent then receives a copy of the interview notes that neither the individual nor his legal representative currently can secure under FOIA. If the respondent is represented, his or her counsel will receive a copy of the notes. By then, however, the legal representative's ability to address the notes and adequately prepare the client and the case has been seriously hampered. Even where it may be possible to secure a continuation of proceedings, there are negative consequences. Due to the immense load of cases handled by the Immigration Courts and the effects of the backlog, a continuance can result in postponement of the proceedings for lengthy periods of time. This delay, in turn, can negatively affect witnesses' memories and availability, increase the stress level for the asylum seeker, and prolong the time when the applicant is separated from a spouse or children he or she had to leave behind when fleeing the home country.

45. Even when the Asylum Officer interview notes are not used against a client in removal proceedings, an attorney representing an affirmative asylum applicant in subsequent proceedings is impeded in his or her ability to provide the highest level of quality representation when it is not possible for the notes to be secured under FOIA or by other means.

46. As explained above, without the asylum interview notes, Plaintiff lacks information that is necessary for him to fully assess individual clients' cases and this in turn impedes his ability to present the clients' cases and to advise his clients.

47. Further, when Plaintiff does not have the notes of his clients' asylum interviews,

Plaintiff typically must spend significant additional time with affected clients in an effort to reconstruct their interviews from memory. This is an extremely poor substitute for the notes themselves, however, for reasons that include the effects of the passage of the time and the difficulty clients have in remembering the content of their interviews due to the stress they are commonly under in the interviews themselves. And having to devote the additional time to this subject in meetings with clients has a negative impact on Plaintiff's law practice. The time and administrative burden involved in having to file administrative appeals to challenge the withholding of the Asylum Officer interview notes in each affected client's case also negatively impacts Plaintiff's law practice.

48. On information and belief, neither USCIS nor DHS had a basis for instituting a change in any policy governing the production of Asylum Officer interview notes in response to FOIA requests. The purpose and uses of the notes have not changed, nor have the instructions for their creation.

49. Defendant agencies have been acting in an arbitrary and capricious manner in withholding the notes. The AOBTC "Note-Taking" lesson module continues to provide that while Asylum Officers' interview notes are generally not provided in response to a FOIA request, there are instances in which they are produced. *See* Exhibit A at 4. No basis for producing them in some cases and withholding them in others is given. And while expressing a general rule against producing the notes in response to FOIA requests, the agency continues to reserve for itself the option of introducing them as evidence in proceedings. *See* Exhibit A at 4.

### Plaintiff's FOIA Requests and Exhaustion of Administrative Remedies

50. With their consent and on their behalf, Plaintiff Jeffrey Martins has made numerous requests under the FOIA for the contents of his clients' A-Files, including the Asylum Officer notes of the clients' respective asylum interviews. These requests are made using the Form G-639, which specifically provides for a records request to encompass the "Complete Alien File (A-File)." Examples of these requests are described below, with corresponding control numbers used by the agency to identify and track FOIA requests. In each case, Mr. Martins is identified as being the "requestor." His clients whose records are the subjects of the requests are identified below by

DAVIS WRIGHT TREMAINE LLP

initials to protect the confidentiality of their asylum applications. All of these clients have their cases pending at the Immigration Court and are awaiting their individual merits hearings, some of which are set for the very near future.

51. In response to all of the requests identified here, Defendants withheld a substantial number of pages from the requested A-Files. Pages have been either withheld in their entirety or partially redacted, but pages deemed to have been released in part can have all substantive content redacted and show only the name and alien registration number of the person who is the subject of the A-File. Plaintiff has appealed the withholding of responsive documents in all these cases and in all such appeals has specifically challenged the withholding of the Asylum Officer interview notes. The notes have not been released in response to any of the requests detailed here.

52. On or about March 26, 2012, Plaintiff submitted a request under the FOIA for the A-File of his client, N.S. This request is identified as NRC2012026531. In its response, USCIS indicated that it had identified 190 pages as responsive to the request. On or about April 12, 2012, USCIS indicated it was releasing 58 pages in full and 57 pages in part to Plaintiff, while withholding 54 pages in full. USCIS further indicated that it was referring an additional 21 pages to another agency for it to respond directly to Plaintiff. On or about May 29, 2012, Plaintiff appealed the determination to withhold material covered by the request, specifically challenging the withholding of the notes taken by the Asylum Officer at N.S.'s asylum interview. On or about June 10, 2012, after receiving Plaintiff's appeal, USCIS indicated it was releasing an additional 52 pages, 15 in full and 37 in part, to Plaintiff. However, with the exception of one page, which laid out questions and answers pertaining to the mandatory bars to asylum, the Asylum Officer's notes of N.S.'s interview were not among the pages released. Defendants have continued to withhold the Asylum Officer notes of N.S.'s interview.

53. On or about April 12, 2012, Plaintiff submitted a request under the FOIA for the A-File of his client, A.A.G. This request is identified as NRC2012033089. In its response, USCIS indicated that it had identified 488 pages as responsive to the request. On or about May 29, 2012, USCIS indicated that it was releasing 242 pages in full and 17 pages in part to Plaintiff. The agency's response indicated that 88 pages were withheld in their entirety and an additional 6 pages

were referred to other agencies for those entities to respond directly to Plaintiff. On or about June 19, 2012, Plaintiff appealed the determination to withhold information covered by the initial FOIA request and specifically challenged the withholding of the notes that the Asylum Officer took during A.A.G.'s asylum interview. On or about July 23, 2012, after receiving the appeal, USCIS indicated it was releasing an additional 20 pages in part to Plaintiff. However, Defendants have continued to withhold the Asylum Officer's notes of A.A.G.'s interview.

54. On or about May 23, 2012, Plaintiff submitted a request under FOIA for the A-File of his client, C.S. This request is identified as NRC2012046553. On or about June 5, 2012, USCIS responded, indicating that it had identified 1,413 pages as responsive to Plaintiff's request. USCIS indicated that it was releasing 1,258 pages in full and 16 pages in part and withholding 99 pages in full. USCIS further indicated that it was referring an additional 21 pages to another agency for it to respond directly to Plaintiff. On or about June 5, 2012, Plaintiff appealed the determination to withhold responsive material, specifically challenging the withholding of the notes documenting the two Asylum Office interviews of C.S. On or about July 19, 2012, after receiving Plaintiff's appeal, USCIS indicated it was releasing an additional 11 pages in part to Plaintiff. However, Defendants have continued to withhold the Asylum Officer notes of C.S.'s interviews.

55. On or about May 1, 2012, Plaintiff submitted a request under FOIA for the A-File of his client, T.L. This request is identified as NRC2012038580. On or about May 22, 2012, USCIS informed Plaintiff of the agency's determination to withhold 10 pages in part and 63 in full. On or about June 5, 2012, Plaintiff appealed the determination to withhold responsive material and included a specific challenge to the withholding of the notes documenting T.L.'s interview at the Asylum Office. On or about July 16, 2012, USCIS indicated it was releasing an additional 38 pages to Plaintiff. However, Defendants have continued to withhold the Asylum Officer notes of T.L.'s interview.

56. On or about June 1, 2012, Plaintiff submitted a request under FOIA for the A-File of his client, K.L. This request is identified as NRC2012049919. On or about June 12, 2012, USCIS responded, stating that it had identified 171 responsive pages. USCIS indicated that it was releasing 108 pages in full and 14 in part to Plaintiff. On or about June 19, 2012, Plaintiff

appealed the determination to withhold responsive material and included a specific challenge to the withholding of the notes of his client's asylum interview.  In response to Plaintiff's administrative appeal, on or about July 19, 2012, USCIS indicated that it was releasing an additional 14 pages in part and 4 in full to Plaintiff.  However, Defendants have continued to withhold the notes of K.L.'s asylum interview.

57.  On or about June 15, 2012, Plaintiff submitted a request under FOIA for the A-File of his client, E.E.  This request is identified as NRC2012055907.  On or about July 3, 2012, USCIS indicated that it had identified 200 responsive pages and was releasing 169 pages in full and 9 pages in part to Plaintiff, while withholding 15 pages in full.  USCIS also informed Plaintiff that it was referring an additional 7 pages to other agencies for those entities to respond directly to Plaintiff.  On or about July 12, 2012, Plaintiff appealed the determination to withhold responsive material and specifically challenged the withholding of the notes documenting the Asylum Office interview of E.E.  On or about August 3, 2012, USCIS responded to Plaintiff's administrative appeal and indicated that it would release an additional 2 pages in part.  Defendants have continued to withhold the Asylum Officer notes of E.E.'s interview.

58.  On or about June 15, 2012, Plaintiff submitted a request under FOIA for the A-File of his client, S.S.  This request is identified as NRC2012055854.  On or about July 19, 2012, USCIS indicated that it had identified 177 responsive pages and was releasing 120 pages in full and 10 pages in part to Plaintiff, while withholding 43 pages in full.  USCIS also informed Plaintiff that it was referring an additional 3 pages to another agency for it to respond directly to Plaintiff.  On or about August 24, 2012, Plaintiff appealed the determination to withhold responsive material.  In particular, Plaintiff challenged the withholding of the notes documenting the Asylum Office interview of S.S.  On or about October 1, 2012, USCIS responded to Plaintiff's administrative appeal and indicated that it would release an additional 33 pages in part and one in full.  Defendants have continued to withhold the Asylum Officer notes of S.S.'s interview.

59.  On or about January 19, 2012, Plaintiff submitted a request under FOIA for the A-File of his client, Y.L.  This request is identified as NRC2012003177.  On or about July 3, 2012, USCIS indicated it had identified 231 responsive pages and was releasing 123 pages in full and 9

DAVIS WRIGHT TREMAINE LLP

pages in part to Plaintiff, while withholding 80 pages in full.  USCIS indicated that it was referring an additional 14 pages to other agencies for their direct response to Plaintiff.  On or about July 16, 2012, Plaintiff appealed the determination to withhold responsive material and included a specific challenge to the withholding of the notes of Y.L.'s asylum interview.  In response to Plaintiff's administrative appeal, on or about August 7, 2012, USCIS released an additional 40 pages in part and one in full.  However, Defendants have continued to withhold the notes of Y.L.'s interview.

60.  On or about July 27, 2012, Plaintiff submitted a request under FOIA for the A-File of his client, I.A. This request is identified as NRC2012069832.  On or about August 15, 2012, USCIS responded and indicated it would withhold 27 responsive pages in full and 9 such pages in part.  On or about August 21, 2012, Plaintiff appealed the determination to withhold responsive material and included a specific challenge to the withholding of the notes of I.A.'s asylum interview.  In response to Plaintiff's administrative appeal, on or about September 27, 2012, USCIS indicated it was releasing an additional 2 pages in part.  Defendants have continued to withhold the notes of I.A.'s interview.

61.  On or about November 1, 2012, Plaintiff submitted a request under FOIA for the A-File of his client, M.A. This request is identified as NRC2012099752.  USCIS's response indicated that it had identified 195 pages as responsive to the request.  USCIS agreed to release 152 pages in full and 9 pages in part to Plaintiff, while indicating it was withholding 24 pages in full.  On or about December 17, 2012, Plaintiff appealed the determination to withhold responsive material and included a specific challenge to the withholding of the notes of M.A.'s interview at the Asylum Office.  On or about December 26, 2012, USCIS acknowledged receipt of the administrative appeal and assigned control number APP2012001489 to the appeal.  To date, Plaintiff has not received any further response to the administrative appeal, and Defendants have continued to withhold the Asylum Officer notes of M.A.'s asylum interview.

62.  In addition to filing administrative appeals of the withholding of responsive documents and specifically challenging the withholding of the Asylum Officer interview notes, Plaintiff was offered and pursued the option of assistance from the Office of Government

DAVIS WRIGHT TREMAINE LLP

Information Services (OGIS) in resolving the dispute over whether the Asylum Officer notes documenting the asylum interviews were properly withheld.  Mr. Martins provided OGIS with five examples of FOIA requests – those made for the A-Files of N.S., C.S., A.A., N.S., and Y.L. – that were met with a denial of production of the Asylum Officer interview notes.

63.  In its September 26, 2012 letter to Mr. Martins closing the matter, OGIS explained that it had consulted USCIS FOIA Public Liaison Jill Eggleston and counsel for USCIS, Alan Hughes, who reviewed the records at issue and affirmed the agency's decision to withhold the records.  OGIS further communicated that in response to future requests, USCIS would endeavor to cite the basis for its position that the interview notes and certain other asylum-related material are exempt from FOIA.

64.  Following the OGIS's final communication with Plaintiff, in letters addressing administrative appeals by Plaintiff for A-File FOIA requests that were not among the examples given to the OGIS, USCIS specifically communicated the basis it claims for withholding Asylum Officer interview notes.  In the agency's September 27, 2012 letter responding to Mr. Martins's administrative appeal of the withholding of responsive records including the asylum interview notes from the A-File of his client I.A., Mr. Hughes of USCIS informed Mr. Martins of the agency's position that asylum interview notes "are appropriately withheld pursuant to 5 U.S.C. § 552(b)(5)."  Through Mr. Hughes, USCIS reiterated this position in the agency's October 1, 2012 letter responding to Mr. Martins's administrative appeal of the withholding of responsive records including the asylum interview notes from the A-File of his client S.S.

65.  Plaintiff has exhausted all administrative remedies available to him.

## FIRST CAUSE OF ACTION

### Violation of Freedom of Information Act (FOIA)

### For Failure to Disclose Responsive Records

66.  Plaintiff repeats, alleges, and incorporates as if set forth fully herein each and every allegation contained in the above paragraphs.

67.  Defendants have violated 5 U.S.C. § 552(a)(3)(A) by failing and refusing to promptly

DAVIS WRIGHT TREMAINE LLP

1  release agency records in response to the FOIA requests detailed above and to other requests made

2  for the same type of records.  Refusal to provide this information is unlawful.

3      68.  Injunctive relief is authorized under 5 U.S.C. §552(a)(4)(B) because Defendants

4  continue to improperly withhold the requested material, and do so as a matter of policy or practice,

5  in violation of the FOIA.  Plaintiff and those he represents will suffer irreparable injury from, and

6  have no adequate legal remedy for, Defendants' illegal withholding of the Asylum Officer

7  interview notes.

8      69.  Declaratory relief is authorized under 22 U.S.C. § 2201 because an actual controversy

9  exists regarding Defendants' improper withholding of the Asylum Officer interview notes in

10  violation of the FOIA.  An actual controversy exists because Plaintiff contends that Defendants'

11  continuing failure to release the records is in violation of law and Defendants contend otherwise.

12  **SECOND CAUSE OF ACTION**

13  Violation of Administrative Procedure Act (APA)

14      70.  Plaintiff repeats, alleges, and incorporates as if set forth fully herein each and every

15  allegation contained in the above paragraphs.

16      71.  Defendants' policy and practice of withholding Asylum Officer notes in response to

17  FOIA requests constitute "final agency action for which there is no other adequate remedy in a

18  court" within the meaning of the APA, 5 U.S.C. § 704.

19      72.  Defendants' policy and practice of withholding Asylum Officer notes in response to

20  all or some FOIA requests constitute final agency action that is "arbitrary, capricious, an abuse of

21  discretion, or otherwise not in accordance with law," in violation of the APA, 5 U.S.C. §

22  706(2)(A).

23      73.  Defendants' change in policy and practice to withhold Asylum Officer notes in

24  response to all or some FOIA requests constitutes final agency action that is "arbitrary, capricious,

25  an abuse of discretion, or otherwise not in accordance with law," in violation of the APA, 5 U.S.C.

26  § 706(2)(A).

27      ///

28      ///

DAVIS WRIGHT TREMAINE LLP

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that judgment be entered in his favor against Defendants, and that the Court:

(a) Declare that Defendants' failure to disclose responsive records violates FOIA;

(b) Declare unlawful and enjoin Defendants' policy and practice of withholding Asylum Officer notes that are responsive to a properly submitted request under the FOIA and not otherwise exempt;

(c) Order Defendants and any of Defendants' departments, components, other organizational structures, agents, or other persons acting by, through, for, or on behalf of Defendants to conduct a prompt, reasonable search for records responsive to Plaintiff's FOIA requests;

(d) Enjoin Defendants and any of Defendants' departments, components, other organizational structures, agents, or other persons acting by, through, for, or on behalf of Defendants from withholding records responsive to Plaintiff's FOIA requests and order them to promptly produce the same;

(e) Enjoin Defendants and any of Defendants' departments, components, other organizational structures, agents, or other persons acting by, through, for, or on behalf of Defendants from withholding asylum interview notes in response to future properly submitted FOIA requests and order them to promptly produce the same where the asylum applicant to whom the notes pertain has consented to their release;

(f) Award Plaintiff his reasonable attorneys' fees and costs pursuant to 5 U.S.C. § 552(a)(4)(E) and 28 U.S.C. § 2412; and

///
///
///
///
///
///
///

COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF

1    (g) Grant all other such relief to Plaintiff as the Court deems just and equitable.

2

3    Dated:  February 11, 2013                Respectfully submitted,

4

5

6                                            Thomas R. Burke
7                                            Jeff Glasser
                                             DAVIS WRIGHT TREMAINE LLP
8                                            505 Montgomery Street, Suite 800
                                             San Francisco, California 94111-6533
9                                            Telephone: 415.276.6552
                                             Facsimile: 415.276.6599
10                                           thomasburke@dwt.com

11                                           Robin L. Goldfaden
12                                           LAWYERS' COMMITTEE FOR CIVIL
                                             RIGHTS OF THE SAN FRANCISCO BAY AREA
13                                           131 Steuart Street, Suite 400
                                             San Francisco, CA 94105
14                                           Telephone: 415.543.9444 ext. 201
                                             Facsimile: 415.543.0296
15                                           rgoldfaden@lccr.com

16

17                                           *Attorneys for Plaintiff*

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY RELIEF AND INJUNCTIVE RELIEF
DWT 21145309v1 0050033-000045

# EXHIBIT A

# Lesson Plan Overview

| | |
|---|---|
| **Course** | Asylum Officer Basic Training |
| **Lesson** | ***Interviewing Part II:  Note-Taking*** |
| **Rev. Date** | August 10, 2009 |
| **Lesson Description** | This lesson informs asylum officers about the importance of taking clearly written and comprehensive notes during the interview and the characteristics of proper notes and proper note-taking.  Through practical exercises, students will learn techniques for proper note-taking. |
| **Field Performance Objective** | Given the field situation of interviewing an applicant for asylum (and witnesses, if any), the asylum officer will be able to elicit in a nonadversarial manner and clearly record all relevant information necessary to adjudicate the asylum claim and to issue documents initiating removal proceedings. |
| **Interim (Training) Performance Objectives** | 1.  Write legible interview notes. |
| | 2.  Record all pertinent points of the asylum interview. |
| | 3.  Identify who may have access to an asylum officer's interview notes. |
| | 4.  Recognize when an asylum officer is required to switch to "Question-and-Answer" format of note-taking. |
| **Instructional Methods** | Lecture, practical exercises |
| **Student Materials/ References** | Participant Workbook; 8 CFR § 208.6; Selected Legal References and Supplemental Information binder (section with sample notes) |
| **Method of Evaluation** | Practical exercise exam, Written test |

## CRITICAL TASKS

**SOURCE:**  **Asylum Officer Validation of Basic Training Final Report (Phase One), Oct. 2001**

| Task/ Skill # | Task Description |
|---|---|
| 022 | Take detailed legible notes. |
| 023 | Take sworn statements in "Q & A" format when required. |
| SS 4 | Ability to write clearly, concisely, and grammatically in the English language. |

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 3
II.   OVERVIEW ...................................................................................................... 3
III.  PURPOSE OF TAKING NOTES ...................................................................... 3
      A.   Purpose .......................................................................................................... 3
      B.   Access ............................................................................................................ 3
IV.   CHARACTERISTICS OF PROPER NOTES ................................................... 4
      A.   Must be Legible .............................................................................................. 4
      B.   Must Accurately Reflect What the Applicant Says as Well as What the Asylum Officer Asks 5
      C.   Must Not Include the Asylum Officer's Subjective Opinions, Suppositions, or Personal
           Inferences ....................................................................................................... 5
      D.   Do Not Need to Contain Every Word the Applicant Has Said .......................... 6
      E.   Must Include What the Applicant Did Not Say, When Appropriate ..................... 7
      F.   Must Indicate Who Said What if More than One Person is Providing Information .............. 7
      G.   Must Include the Date, A-Number, and Asylum Officer's Name ....................... 7
      H.   Must Not Include Abbreviations That Someone Else Will Not be able to Understand .......... 7
      I.    Must Include a Notation that the Oath was Administered to the Interpreter Monitor ............ 8
      J.    Must Include Both Interpretations Where There is a Dispute in Interpretation between the
            Applicant's Interpreter and the Interpreter Monitor .................................................... 8
V.    CHARACTERISTICS OF PROPER NOTE-TAKING ....................................... 8
      A.   The Asylum Officer Must Develop a Non-Intrusive Technique for Taking Notes ................. 8
      B.   The Asylum Officer Must Not Become so Engrossed in Taking Notes That the Interaction
           with the Applicant Becomes Secondary ...................................................................... 9
VI.   SUMMARY ....................................................................................................... 9

| Presentation | References |
|---|---|

## I.   INTRODUCTION

This lesson informs students about the importance of taking **clearly written and comprehensive** notes during the interview and the characteristics of proper notes and proper note-taking.

Instructor Note #1

## II.   OVERVIEW

It is essential for asylum officers to take clearly written and comprehensive notes during the interview. Interview notes must accurately reflect what transpired during the interview so that a reviewer can reconstruct the interview by reading the interview notes. In addition, the interview notes should substantiate the asylum officer's decision. The quality of the notes will help determine the quality of the written assessments.

If the notes are sketchy, they will not give a complete picture of what occurred during the interview. The asylum officer will have problems remembering information when writing the assessment, particularly if there is a delay between interviewing the applicant and writing the assessment, or if another asylum officer writes the decision.

## III.   PURPOSE OF TAKING NOTES

### A.   Purpose

There are two main purposes of taking notes:

1.   to substantiate the asylum officer's decision regarding credibility and the applicant's eligibility for asylum, and

2.   to enable a reviewer to reconstruct the discussion that took place during the asylum interview.

### B.   Access

The following individuals may have access to interview notes.

1.   Certain Asylum Office staff

Supervisory asylum officers review interview notes when reviewing assessments and NOIDs. Other Asylum Office staff, such as Quality Assurance / Trainer, Deputy Director, and Director may also review notes in certain cases. In addition, other asylum officers review files, including

Instructor Note #2

interview notes, in cases in which the interviewing officer could not complete the case or, in some cases, if there is a need to reinterview the applicant.

2.   Headquarters staff

Headquarters quality assurance reviewers and country of origin information researchers sometimes review cases, including interview notes.

3.   ICE Trial attorneys and immigration judges

ICE Trial attorneys have access to the files of cases that are referred to the immigration judge or denied by the asylum officer.  If interview notes are introduced to the court as evidence, the immigration judge will also see the interview notes.

4.   U.S. government officials

Certain government officials or contractors as indicated in 8 C.F.R. § 208.6 may review information pertaining to certain asylum applications.

8 CFR § 208.6

5.   Applicants and their representatives

Some asylum applicants or their representatives may obtain the notes as part of a Freedom of Information Act (FOIA) request.  Although generally, notes are not provided in response to a FOIA request, there have been occasions when they have been provided.

In addition, if interview notes are introduced as evidence in proceedings in Immigration Court, the applicant and representative are given a copy of the notes.

## IV.  CHARACTERISTICS OF PROPER NOTES

Instructor Note #3

### A.   Must be Legible

As noted above, a number of persons may have need to read interview notes, so notes must be written in a legible manner.

Instructor Note #4

**B.    Must Accurately Reflect What the Applicant Says as Well as What the Asylum Officer Asks**

A reviewer should be able to reconstruct what transpired during the interview by reading the interview notes.  The interview notes should substantiate the asylum officer's decision.

Asylum officers interview several applicants in a day.  When the asylum officer writes the assessments later in the day, the facts of one case can blur with the facts of another case.  In addition, extenuating circumstances may delay the writing of an assessment, or require another officer to write the assessment. Therefore, it is imperative that the notes be sufficiently detailed and clear.

Furthermore, accurate interview notes are crucial for probing into the internal consistency of an applicant's claim.                    **Instructor Note #5**

Interview notes should include clearly the following:

1.    Factors that address the elements of the refugee definition

2.    Factors that affect credibility, including the applicant's opportunity to respond to any perceived inconsistencies

3.    Factors that relate to mandatory bars and discretionary denials

4.    Indications that the asylum officer pursued all relevant lines of questioning, followed-up on relevant points, and    **Instructor Note #6** provided the applicant to add additional information before the conclusion of the interview

5.    The applicant's (and any dependent's) current immigration status

6.    Factors that relate to the one-year filing deadline

**C.    Must Not Include the Asylum Officer's Subjective Opinions,    **Instructor Note #7** Suppositions, or Personal Inferences**

This should not be confused with subjective statements that the applicant may make.  Such statements made by the applicant should be included in the notes.

Asylum officers should take care that their notes will be perceived by others as an accurate and objective record of the

interview. For example, even an exclamation point placed in reaction to a portion of the applicant's testimony may appear as a judgment of the applicant's claim.

### D. Do Not Need to Contain Every Word the Applicant Has Said

1. General rule

   Notes should focus on key issues, people, places, dates, and events. Recording every word the applicant says is time-consuming and can substantially detract from the interview process. There may be rare instances, however, when every word is essential in order to capture the meaning of what the applicant said.

2. Question & Answer Notes

   The Asylum Division procedures require that asylum officers take notes in a question & answer (Q&A) format in the following circumstances:

   *See, Asylum Procedures Manual, section II.2.J.9., Note-Taking by an AO During an Asylum Interview; See also, lesson, Bars to Asylum Relating to National Security*

   a. The applicant admits, or there are serious reasons to believe, he or she is associated with an organization included on either the Foreign Terrorist Organizations List or the Terrorist Exclusion List, both of which are compiled by the Department of State and are available at http://www.state.gov/s/ct/.

   b. The applicant admits, or there are serious reasons to believe, she or he is involved in terrorist activities.

   c. The applicant admits, or there are serious reasons to believe, he or she assisted or otherwise participated in the persecution of others on account of one of the five protected grounds.

   d. There are serious reasons for considering the applicant a threat to national security.

   *Instructor Note #8*
   *Note: SAO concurrence might be required before switching to Q&A notes. Check with the local office for procedures.*

   e. The applicant admits, or there are serious reasons to believe, that he or she committed or was convicted of a serious crime outside of the U.S. and the file does not contain a record of the conviction.

   f. The applicant admits, or there are serious reasons to believe, he or she committed human rights abuses

   The asylum officer should switch to Q&A format notes once the applicant provides any information relating to any

of the above circumstances.  Q&A notes should begin on a separate page and continue through to the conclusion of the interview.  Q&A notes do not have to be a verbatim record of everything said at the interview, but they must provide an accurate record of the specific questions asked and the applicant's specific answers.

Each page should include the applicant's A-number, the date of the interview, and the AO's name.

At the conclusion of the interview, the AO should review the notes with the applicant, making any corrections requested, and have the applicant initial each page of the notes.  Both the AO and the applicant print and sign their names on the last page of the interview notes, and the AO draws a diagonal line from the bottom of the page to the end of the testimony.

### E.    Must Include What the Applicant Did Not Say, When Appropriate

It is sometimes important to include what the applicant did not say.  For example, if the applicant does not know an answer or appears to be evasive, it is appropriate to include in the notes comments such as, "Applicant does not know who threatened her," or "Applicant was asked 3 times in different ways to describe arrest in detail, but would answer only that he was arrested."  It is important to be as objective as possible when writing such notes.

### F.    Must Indicate Who Said What if More than One Person is Providing Information

Witnesses may provide testimony on behalf of the applicant, or the asylum officer may make a statement he or she wants recorded in the notes.  In addition, the representative may make a statement at the end of the interview, or may ask the applicant additional questions.  In these situations, the asylum officer should clearly indicate in the notes who is speaking.

### G.    Must Include the Date, A-Number, and Asylum Officer's Name

### H.    Must Not Include Abbreviations That Someone Else Will Not be able to Understand

If an asylum officer uses abbreviations, they should be few in

number and should be clear enough that anyone who reviews the notes will understanding what they mean from the content of the notes. Shorthand should never be used.

I. **Must Include a Notation that the Oath was Administered to the Interpreter Monitor**

On some occasions during an asylum interview, a professional interpreter will be used to monitor (via telephone) the interpretation by the applicant's interpreter. As the interpreter monitor is not present at the interview to sign an oath form, the notes must indicate that the oath was administered to the interpreter monitor. Note that some offices fulfill this requirement by having officers complete a Monitor's Oath form. (See, for example, the form used by the Miami Asylum Office, available on the Asylum Virtual Library in the "Affirmative Asylum: Interpreters" Collection.

J. **Must Include Both Interpretations Where There is a Dispute in Interpretation between the Applicant's Interpreter and the Interpreter Monitor**

When using a professional interpreter to monitor the interpretation of the interpreter provided by the applicant, there may be instances in which a dispute in interpretation between the interpreter monitor and the applicant's interpreter arise. If there is such a dispute, the asylum officer must give the applicant's interpreter an opportunity to provide a reasonable explanation for the discrepancy. If the applicant's interpreter is unable to do so and the interpreted testimony will be used in the assessment, the asylum officer must use the interpreter monitor's interpretation of the applicant's testimony in the assessment; however, the interview notes must preserve both the interpretation given by the applicant's interpreter and the interpreter monitor, clearly indicating which interpretation was provided by the monitor and which was provided by the applicant's interpreter.

V. **CHARACTERISTICS OF PROPER NOTE-TAKING**

A. **The Asylum Officer Must Develop a Non-Intrusive Technique for Taking Notes**

1. The asylum officer must take notes in a way that minimizes loss of rapport and does not distract from the applicant's ability to discuss his or her claim, yet ensures

Instructor Note #9

*Affirmative Asylum Procedures Manual,* section II.2.J.4.b.v., *Working with the Contract Interpreter;* Langlois, Joseph. USCIS Office of Refugees, Asylum and International Operations. *Award of Interpreter Services Contract and Interim Guidance on Monitoring of Asylum Interviews by Contract Interpreters.* Draft Memorandum to All Asylum Office Personnel, distributed on February 8, 2006.

Asylum Officers may need to reschedule the interview with a different interpreter if the applicant-provided interpreter willfully misrepresents the applicant's testimony, is incompetent to translate, or displays improper conduct. Documentation of these incidents in the officer's notes may be useful in supporting requests to reschedule with a different interpreter, and if necessary, bar the interpreter from the Asylum Office. *See Affirmative Asylum Procedures Manual,* Section 2.J.4.

that necessary information is recorded to justify decisions.

2.    When an interpreter is present, the asylum officer can use the time when the interpreter is speaking to write notes. Otherwise, the asylum officer can ask a question, addressing the applicant directly, listen to the answer, and then write down the information.

3.    Note-taking may be intimidating to the applicant. The asylum officer should explain toward the beginning of the interview (during the introduction component of the interview) that he or she will be taking notes during the interview, the purpose in taking notes, and that the notes will be kept confidential.

4.    Officers who type their notes during the interview must go to additional lengths to prevent the note-taking from interfering with rapport-building.

Officers must become comfortable with taking notes on the computer so that it does not interrupt the flow of the interview. For example, the officer should not have to pause the interview for significant lengths in order to type or to adjust the formatting of the document. In addition, the computer monitor should be placed at an angle so that the officer can maintain eye contact with the applicant, interpreter, and attorney (if present).

Before beginning to take notes, the officer should explain to the applicant the use of the computer as a way to take notes of the interview.

**B.    The Asylum Officer Must Not Become so Engrossed in Taking Notes That the Interaction with the Applicant Becomes Secondary**

If an asylum officer focuses more on taking notes than on paying attention to the applicant, it may appear as if the asylum officer is not listening, which can be very distracting to the applicant. Recording notes must always be subordinate to interviewing the applicant.                                                    **Instructor Note #10**

## VI.    SUMMARY

**A.    The Purpose of Note-Taking**

1.  To substantiate the asylum officer's decision regarding the applicant's eligibility (including credibility) for asylum; and

2.  To enable the reviewer to reconstruct the discussion that took place during the asylum interview

**B.   Interview Notes:  Legible, Accurate, Objective**

A number of individuals may have access to and may review interview notes.

Interview notes

- must be legible

- must accurately reflect what transpired during the interview

- must not contain the asylum officer's subjective opinions

- do not need to include every word the applicant says

- must include what the applicant did not say when appropriate

- must indicate who said what

- must not include shorthand or abbreviations that cannot be understood

- must include the date, A-#, and asylum officer's name

**C.   Note-Taking Should be Non-Intrusive**

Taking notes is secondary to the interaction between the asylum officer and the applicant.

# EXHIBIT B

# Supplemental Release

Pg. 1 of 15

A#
Name:
Date  4/2/08

AO: Brenda Leanhart
ZSF 181

Interview Start:  8:40
Interview Finish:

**Monitor Information**
Monitor Number  1507269
Start Time: 09:15
End Time:
Language:

*NOTE: This is not a verbatim summary of this proceeding.*

**To applicant:**
    Purpose: to collect information
    First we will go through your application
    Then I will ask specific questions about what happened to you
**To interpreter:**
    If I do not speak clearly enough or loudly enough, please let me know
**To applicant:**
    If you don't understand something, please let me know
    If don't know, ok to say "I don't know"
    Ask questions if don't understand
    It's important that you understand me and to understand your interpreter
    Do you understand me so far?  yes
    Do you understand your interpreter?  yes

**Role of Interpreter**
    Only here to translate, not legal representative
    Will interpret everything we say word-for-word
    Will not converse or explain things to you, my job.
    Conversation between you and me, if questions, ask me.

**Confidentiality**
    Confidential within US govt
    Application not reported to home country

**No decision today** – you come back to pick up decision

**Background Info**

Do you have any documents that you would like to submit today?  submited

83

Supplemental Release

A#                                          AO: Brenda Leanhart
Name:                                       ZSF 181
Date  4 _. . .

## ADMINISTRATIVE TASKS AND INFORMATION

Present at interview: Applicant / Interpreter

Do you have an attorney?      no

G-28 in file?   no

Monitor oath form complete?   yes

Interpreter oath form complete?      yes

Interpreter ID copied for file?      yes

Applicant oath form complete?      yes

Does applicant understand information on the oath form?      yes

Does applicant have any questions about oath form?      no

Oath administered?  yes


Applicant's Oath →        Do you solemnly swear that the testimony you give will be
                          the truth, the whole truth, and nothing but the truth?

Interpreters Oath →       Do you solemnly swear to interpret all questions and
                          answers truthfully and accurately?

Monitor's Oath →          See monitor sheet

## I-589 INFORMATION

I-589 and declaration were completed by whom?

How do know this person?  I met him in Sunnyvale temple

84

Pg. 3 of 15

A#                                      AO: Brenda Leanhart
Name:                                   ZSF 181
Date

What kind of temple?  Hindu temple

Name of temple?  Sunnyvale temple

Where is it located?  Sunnyvale city

Where in Sunnyvale?  I don't know; I went with my friend

How many times have you gone to temple?  5 or 6 times

After you signed, was I-589 and declaration reviewed with you in language that you
understand?       yes

After you signed your application were you given a copy of it?    yes

Were you given a copy of your declaration?    yes

Are you aware of contents of I-589 and declaration?   Yes but I need one correction; I am
not  a memeber of any party

Can you tell where the correction is?  (he gets out his copy of I-589 and shows page 5, page
6 changes)

Are the contents true and correct?      yes

Have you applied for asylum or refugee status any other time in U.S., or in any other
country?    no

(he is starting to answer without waiting for translations)

Would you like to make any changes in I-589 at this time?   no

Have you ever used any other names?  no

Have you ever used any other date of birth?  no

Ever made any false statements to someone who works for the U.S. Govt?    no

Ever used or presented any false or fraudulent documents to someone who works for the
U.S. Govt?    no

Supplemental Release

85

Pg. 4 of 15

A#                                          AO: Brenda Leanhart
Name:                                       ZSF 181
Date

Do you speak Hindi fluently?
        Yes

So you speak two languages fluently?
        Hindi and Punjabi

Do you know English?
        A little

Can you read and write English?
        Yes some

Speaking English?
        A little, like my name

Do you have any other family members in the United States?  no

Who are you living with?  With my friend

Name?

How do you know this person?   This belongs to my city – my native city

What city is that?  D

Where is that?  P

Does your friend have asylum in the US?  I don't know; he is he

How did you learn about asylum?  At the Sunnyvale when I met
him all that happened in my country that I was beaten and he said that if that is the case I
can tell the govt here

College education?  Yes

Finished in 2003?  Yes

Supplemental Release

A#                                    AO: Brenda Leanhart
Name:                                 ZSF 181
Date

## ENTRY INFORMATION

DOE:  3-11-07          POE:  Chicago        Manner of entry:   I came on basis of a factory

How many times have you entered the U.S.?   one

Departure from U.S. after claimed entry?   no

What passport did you use to enter the U.S.?   copy in file

## VISA INFORMATION

How many times have you applied for a US VISA?  one

Did you complete the U.S. VISA(s) application yourself?  No

Who helped you?  There was an agent

What did the agent do for you?   He prepared me for the interview

Did he review the Visa application with you?  Yes

Do you know what the VISA appliaiton said?  yes

Was the information on the U.S. VISA application  correct and true?   I don't  know

You just said the agent reviewed th appleiaiton with you?
        Yes

Do you know the contents of that VISA applicaiotn?  I remember some

Was it true and correct?  Yes

Everything on it was true?   I don't know he told me to read it

Did you read it?  Yes

Supplemental Release

87

Pg. 6 of 15

A#                                              AO: Brenda Leanhart
Name:                                           ZSF 181
Date

And was it true?   He told me to read it and he said you have to say it like this

Did you personally appear for an interview in order to get a US Visa?   yes

Did you speak with a US VISA official regarding your U.S. VISA application?  yes

Was that at the U.S. consulate or embassy?  yes

Did that official ask you questions?  yes

Were your answers to this official the truth?   Whatever I was told I told that

What are you trying to say?   He has told me that when they ask this question tell these
correct answers

You already told me that your answers to the U.S official were true and correct
        Yes

What did you say was the purpose of your visit to the US?
        I said I was going for a fair

What kind of fair?
        Regarding steel untinsils

Did you attend this fair?
        Yes

Where was the fair?
        In Chicago

Did you use fake documents in order to get your US Visa?
        no

What kinds of documents did you have to show proving that you were going to a fair?
        I was made a partner of that company
So you were really a partner of this company?
        No
You presented fake documents to the VISA official?
        I don't know whatever they told me I said this

Supplemental Release

A#                                     AO: Brenda Leanhart
Name:                                  ZSF 181
Date

Before you left India for the U.S.did you already know that you were not going to leave the
US – that you were not going to return to India?
    Yes
So you did not tell the truth to the VISA official?
    Whatever they told me I told that
Did you tell the truth?
    Whatever was written on the paper is what I told
Please answer the question
    I said whatever they told me to say
Did you check the box on the application that said you were returning and not intending to
stay in the U.S.?
    Yes
Why have you not been telling me the truth
    I had to save my life so what I was told I told that
What did they tell you to say?
    Why are you going there
And what did you say?
    That I am going to the fair
Did the visa official ask if you were intending to return to India?
    Yes
What did you say?
    I told her I would come back
So you did not tell the truth?
    To save my life
Are you going to continue to not tell the truth today with me?
    Its all truth
You have not been candid so far, how am I to trust what you say
    Everything I have said is true
No, you were not candid about not being truthful with the visa official
    What they told me to say is what I said
Are you doing the same thing today with me – did someone tell you what to say to me
today?
    No

Monitor: is there a problem with the translation?
Monitor says no, no problem

## ONE YEAR FILING DEADLINE

One-year filing deadline met?   Met


Supplemental Release

89

A#                                        AO: Brenda Leanhart
Name:                                     ZSF 181
Date

**ASYLUM CLAIM**

      Harm
      Nexus
      Gov't (unable or unwilling to protect)

Why did you leave your country?
      Danger to my life
What danger?
      From the police
Why are you afraid of the police?
      They used to beat me too much
Why did the police beat you?
      They accused me of giving shelter to the militans
What militants?
      Muslim militans
Are you muslim?
      No
Why would the police think you were muslim?
      They did not tell me htat I was muslim they said my friend was mulsim
What was your friends name?
      Z
Was that the only frined the police asked about?
      And there was one more – Z          friend and they asked me about him also
Were you ever arrested?
      Yes
How many times?
      3
When?
      Jan                              005
Did the police say why they arrested you?
      The told me that I helped the militants and that I gave them shelter in my home
Did the police have a name for the militants?
      They had one persons name
What name?
      S
Do you know
      No
Do you who the police were referring to – had you ever heard of S
      No
Did the police accuse of anything else?
      They said I was linked to Lashkar-e Tayyiba

Supplemental Release

A#                                          AO: Brenda Leanhart
Name:                                       ZSF 181
Date

Are you aware of this organization?
    No
Never heard of it?
    I heard from the police
Didn't you say your family was from     J&K?
    Yes
And you've never heard of this organization?
    No
How did you remember the name of the organization?
    The police beat me and told me time and again and said that I was linked with this
It is hard to believe that you lived in India – so near to Punjab and Delhi and have not heard of this organization
    I worked and used to study but I have never heard of this organization
Have you heard of Akali dal Man?
    Little bit
Where you harmed by the police?
    Yes
Tell me about the worst incident
    The second time; first they beat me with sticks; next day they asked me again about giving shelter; they tied my legs and arms hit me with leather strap on back; made me sit down and put hot water on my back; when they put water they made me sit; they made me lie face-down and they rolled wooden roller on my legs and back; they did this only
How long held?
    2 days
How get out?
    Father got me released
How did he do that?
    He told me he got help from a sarpanch and he gave money to the polcie
How did he know you were in jail?
    When I did not open my shop he found out police had arrested me
Repeat
    Somebody told him that your son had been arrested by police
Still not understanding how someone knew you arrested
    I was picked up on the way
On the way where?
    I was in G    my client saw me arrested
Tell me about the wooden roller
    (hold hands apart and motions back and forth)  a round wodden piece and they pressed it on my legs and they pressed my nerves with the roller
They just rolled it on your legs?
    My thighs and my back also

## Supplemental Release

91

A#                                          AO: Brenda Leanhart
Name:                                       ZSF 181
Date   ·

How long did they do this?
     About one hour
One solid hour?
     In between they would talk and start again
How big was the roller?
     (holds hands apart about 3 feet)
Diameter?
     (holds about 6")
This big and this round ( I gesture with my hands)?
     Yes
I'm trying to understand how that could hurt so much?
     They put pressure and they rolled
How did they put pressure?
     They pushed on it with both hands and rolled it
They did that just one time?
     Four or five times
Hour each time?
     No; in one hour they did this four or five times
After they did this rolling what happened?
     I was crying but nobody listened to me; this happened inside the room where I was taken
     for interrogation
How get out of the room?
     They lifted and brought me outside
To the street?
     A corridor and I was brought there and made to sit there
Was anyone sitting with you?
     When I was brought outside my father was there
Did you walk out yourself of escorted out?
     I was lifted
Why lifted you?
     I was not able to walk
When were you able to walk?
     First my father got me release and then we went home on a rickshaw; he took me to
     doctor; then I was treated by him and he gave me medication; I was in hospital for two
     days and slowly I started walking
Do you have medical documents to show your injuries?
     Not at this time
Can you obtain them?
     Yes
How would you obtain them?
     I will tell my family members

## Supplemental Release

A#                                    AO: Brenda Leanhart
Name:                                 ZSF 181
Date

Who lives at
    My uncle
When move to Delhi to live with Uncle?
    Sept. 2003    (uncle's decl says Sept. 2003)
When did you leave his home or stop living with him?
    July
Your declaration says father belonged to       what mean by that?
    He used to live there and his business was there
Is J&K an organization?
    It is a separate state
What does that mean?
    Like India has other states this is one state
What mean by separate state?
    Its on one side
I don't understand
    It is a border state

Were you a member of Lashkar-e Tayyiba (LT)?
    No
Police accused you of this?
    yes
Did you support Lashkar-e Tayyiba (LT)?
    no
Do you support Lashkar-e Tayyiba now(LT)?
    No
Do you know what they stand for or advocate?
    Police told me they kill people
Do you believe now that your friend was a member?
    I don't know
When did this friend visit you?
    He came Jan
You said the worst time you had with the police was the second time?
    Yes
What was that date?
    August         f 2003
So police arrested you in august b/c your frined visited in January?
    They accused me that I give shelter to them and his friend and they told me about
    Shakeel and they said you give them shelter
Then why did police arrest you the first time?
    The same thing
What were you doing to make them arrest you a second time?
    They said I give shelter to the militants

## Supplemental Release

A#                                          AO: Brenda Leanhart
Name:                                       ZSF 181
Date  <

Was it the same police that arrested you both times?
        Yes
You recognized them?
        The persons were different, but it was the same police station
What police station?

In the Punjab:
        Yes
After released the second time how long until you could walk again?
        After two days I started walking slowly then I went to Dehli
Your statement says you were in              en you were arrested the second time
        I was arrested in              police
But you just said you were in              e answers without translation)
        The police brought me to the police station at
How far apart are the two
        10 kilometers
What were you doing in              w the attention from the police?
        I had gone to collect money from a client
Did you create a disturbance?
        No I did not do anything
Tell me what happened
        I was sitting in the shop of my client; and then they came in and arrested me
Just like that
        Yes
Why do you think that happened?
        When they took me they told me there were explosions the day before and they suspected
        that the people that had visited me earlier had a hand in that
Did you ever talk to your friend again?
        no

## FEAR OF FUTURE HARM
Who do you think would harm you if you returned now?
        The police
How would they do that?
        They would accuse me again of giving shelter

### Internal Relocation
Do you think it would be safe to life anywhere else in your country?
        No
Why not?
        I relocated to Delhi and they found me there also

Supplemental Release

94

Pg. 13 of 15

A#                                    AO: Brenda Leanhart
Name:                                 ZSF 181
Date  :

But that arrest was not the same reason was it?
      What mean
In Delhi why arrested?
      b/c in Delhi they said I am a member of Lashkar-e Tayylba and that I helped
them
The police had accused you before of being a member of Lashkar-e Tayyiba?
      No
That was the first time?
      Yes
So this was a new charge – the police in Delhi?
      Yes
So it was not the same charge as before?
      No
When arrested in Delhi it was b/c you were at the wrong place at the wrong time wasn't
it?
      No – I was just going to temple
The police arrested several other young men at the same time?
      Yes
Did the police mention your prior arrests?
      They asked from which place I belonged to and I said I used to live in the Punjab
      and they told me I should show my ID and I did not have any and they took me
      along with them
Why not have ID?
      I had from Punjab but none for Delhi
Is that why they arrested you?
      Yes
B/c you did not have ID?
      Yes
Why not have ID?
      when I came to Delhi I got treatment and was at home for one full year; when you
apply for ID they ask about your past and that is why I did not get b/c they would have
inquired with the police and I was very scared of police

Were you ever fingerprinted or photographed by police?
      Yes
When?
      When I was released the second time
Were you charged with a crime?
      No
Then why did the police take your fingerprints?
      they said they would keep an eye on me
The Indian Punjab police rarely fingerprint anyone
      They were linking me with the explosions maybe because of this

Supplemental Release

95

A#                                          AO: Brenda Leanhart
Name:                                       ZSF 181
Date

This is worrisome – you sure you have not been charged with a crime?
    They never charged me
Are they still looking for you?
    Yes
Why?
    b/c if there is an explosion they will arrest people they have information about
You are a suspect?
    They just accuse me; I am not a militant; I have never done this; I started my
    shop and was working on my shop
But you are Hindu - not Muslim –
    We lived in            I had muslim friends
What is the purpose of the receipt "                 s"?
    It is the shop I had
How would the police find you if you moved somewhere else in India?
    Where ever you live they first ask for ID and then they allow a person to live there
That hardly ever happens and is not enforced
    It happens;
But you lived in Delhi
    I lived with my maternal uncle in Delhi; you need to make a lease for rent and
    that is why they want ID
The police want ID to lease or rent to you?
    No the person renting the place asks and he gets it checked by police
But not everyone does this?
    They do
What kind of work have you done?
    business
You were the boss – you ran the business?
    Yes
Including the purchasing and paperwork?
    Yes
What about the                  what do there?
    Sales and production
Assembly line – producing the product?
    I supervised


<u>Mandatory Bars</u>

These are questions that I ask everyone.

Have you ever harmed anyone for any reason?   no


Supplemental Release                                    96

Pg. 15 of 15

A#                                                    AO: Brenda Leanhart
Name:                                                 ZSF 181
Date

Have you ever helped to harm anyone for any reason?  no

Have you ever been arrested in the U.S.?   no

Were you ever arrested prior to coming to the U.S.?   3 times by police

Did you ever committee any crimes prior to coming to the U.S.?   no

Have you ever been a member of or in any way associated with a terrorist organization?
no

Do you or any member of your family pose a security risk to the U.S.?   no

Have you ever served in the military or police? no

Have you ever carried or owned a firearm or weapon?  no

Have you ever been offered citizenship, asylum or refugee status in any other country?   no

Have you ever received documents such as a work permit, a passport or any other
documents from any other country?

Closing Statements:

Would you like to add anything or Is there anything else that you'd like to tell me which we
have not talked about? no

Other than what you have told me already, is there any other reason you do not want to
return to your country? no

Any questions? no

Sign I-589

Explain pick-up Process

No decision today – you come back to pick up decision (bring interpreter, photo ID)
   1)  approval
   2)  referral to immigration Court – present case again in front of IJ, have right to have
       atty present

Supplemental Release

97