THOMAS R. BURKE (SBN 141930)
JEFF GLASSER (SBN 252596)
KATHLEEN CULLINAN (SBN 287604)
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111-6533
Telephone: 415.276.6500
Facsimile: 415.276.6599
thomasburke@dwt.com; jeffglasser@dwt.com

ROBIN L. GOLDFADEN (SBN 208055)
LAWYERS' COMMITTEE FOR CIVIL RIGHTS
   OF THE SAN FRANCISCO BAY AREA
131 Steuart Street, Suite 400
San Francisco, CA 94105
Telephone: 415.543.9444 ext. 201
Facsimile: 415.543.0296
rgoldfaden@lccr.com

Attorneys for Plaintiff JEFFREY MARTINS

IN THE UNITED STATES DISTRICT COURT

THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JEFFREY MARTINS,<br><br>           Plaintiff,<br><br>     v.<br><br>UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, an agency of the United States Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, in his official capacity as Director of United States Citizenship and Immigration Services; JANET NAPOLITANO, in her official capacity as Secretary of the Department of Homeland Security,<br><br>           Defendants. | Case No. C 13-00591 LB<br><br>**DECLARATION OF JEFFREY MARTINS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>**[Motion for a Preliminary Injunction and Declaration of Thomas R. Burke with Exhibits A-E concurrently filed]** |

-1-
DECLARATION OF JEFFREY MARTINS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. C 13-00591 LB

I, Jeffrey Martins, hereby declare:

1. I am an attorney admitted to practice before all the courts of the State of California and before this Court. I have had my own law practice – the Law Office of Jeffrey Martins, located at 369 Pine Street, Suite 725, in San Francisco, California – for nearly 12 years. My practice is devoted to immigration law with a focus on asylum, family-based petitions for spouses and immediate relatives, deportation defense, and citizenship applications. The matters stated in this declaration are true of my own personal knowledge, and, if called to testify to these facts, I could and would testify competently thereto.

2. I make this declaration in support of the motion for preliminary injunction so that I may obtain immediate access to the Asylum Officer interview notes that are the subject of this litigation. Without immediate intervention by this Court, I am left with a "choice" that no attorney should have to make at all, let alone when handling asylum claims for those who have already suffered grave harm and fear still more. Either I have to represent my clients in removal proceedings without the benefit of knowing information in the Asylum Officer interview notes – leaving my clients vulnerable to being deported to countries where they fear persecution or even death – or I must seek continuances when possible. But even when they can be gotten, continuances are no panacea. They come late in the process and result in further delay for cases that are already painfully drawn out, all while witnesses' memories fade, important evidence disappears, and clients remain separated from family members who are frequently left behind in precarious situations.

**Background**

3. From January 1996 to July 2001, I was employed by the Immigration and Naturalization Service (INS) as an Asylum Officer. During that time, I was involved in the adjudication of more than 3,000 asylum applications. In 1999, I became an Acting Supervisor, and in that capacity I was personally responsible for overseeing approximately one third of the asylum applications then handled by the San Francisco Asylum Office.

4. In my private practice, I now regularly represent asylum seekers before the

-2-
DECLARATION OF JEFFREY MARTINS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. C 13-00591 LB

DWT 22031759v4 0200092-000002

Asylum Office, Immigration Court, the Board of Immigration Appeals, and U.S. Court of Appeals.  In addition to representing clients directly, I serve as a volunteer mentor to pro bono attorneys representing indigent applicants for asylum through a program at the Lawyers' Committee for Civil Rights of the San Francisco Bay Area, and I participate in legal clinics for the Gay and Lesbian Immigrant Rights Task Force and the National Council for Lesbian Rights.  I also provide training on legal ethics, law and procedure to pro bono attorneys.  I have authored articles on various asylum and immigration topics published in national magazines, and I have been selected as a Northern California "Super Lawyer" in the area of immigration law.

### **Practice of Requesting Clients' "A-Files" Under FOIA**

5.        Before contacting my office, many of my clients have had prior contact with the former INS or one of the Department of Homeland Security agencies responsible for the administration and enforcement of federal immigration laws.  In representing clients who are seeking immigration benefits and/or defending against their removal from the country, it is always prudent for me, as their attorney, to have the fullest possible knowledge of clients' immigration histories, prior applications and statements, and related matters.  Having this material greatly informs my knowledge and understanding of clients' eligibility for immigration benefits and which applications they might qualify to submit to remain in the United States.  It also helps me to identify the challenges they face in securing the relief they seek for themselves or family members, including the risks and advantages of moving forward.  I use this knowledge and understanding and draw on my experience in many ways, including in counseling clients and in preparing their applications and litigating removal proceedings.  Thus, as part of my practice, particularly when representing clients before the Immigration Court and in other matters, I routinely submit requests under the Freedom of Information Act (FOIA) to the U.S. Department of Homeland Security and one or more of its constituent agencies, including U.S. Citizenship and Immigration Services (USCIS), for records created or maintained by those agencies.

6.        Through these FOIA requests, I occasionally seek a limited set of specified documents, but more often I request my client's entire Alien File (more commonly known as the A-File).  For clients in removal proceedings, my standard practice is to request the entire A-File.

1  In the cases of my asylum-seeking clients whom the Asylum Office has referred to Immigration
2  Court for removal proceedings, among the key documents that I attempt to secure in requesting the
3  A-File are the "notes" documenting the asylum interviews of my clients by Asylum Officers.
4  These notes are included in the A-Files of individuals who have applied affirmatively for asylum.
5  The notes are essentially the interviewing officer's transcription of all questions and answers
6  during the asylum interview; officers are responsible for taking these notes, which become the
7  record of the interview since there is no recording device or stenographer present.  The notes do
8  not contain the officer's formal assessment of eligibility, the determination of whether the
9  applicant qualifies to be granted asylum, or the reasons why a case should not be approved.  That
10 material goes in a separate document, which is commonly referred to as the "assessment."

11     7.    To make FOIA requests for my clients' A-Files or documents contained in those
12 files, I use Form G-639, Freedom of Information Act/Privacy Act Request, which specifically
13 provides for a records request to encompass the "Complete Alien File (A-File)" or other specified
14 documents.  A true and correct copy of a Form G-639 is attached hereto as Exhibit A.  For each
15 request for a client's A-File or documents within the A-File, the particular client who is the subject
16 of the requested record(s) must provide certain identifying information and his or her signature
17 showing consent to having the requested records released to me as the requestor.  *See* Exhibit A at
18 2.  In all instances in which I request clients' A-Files, I do so with their written consent to have
19 their records released to me.

20     8.    The documents that I request in this manner are integral to the representation
21 that I provide to clients.  As further detailed below, when documents from the A-File are withheld
22 or their production is delayed, my clients are harmed because I am denied access to information
23 that is often critical to their cases.  In particular, in the cases of my clients who are in removal
24 proceedings after having applied for asylum, not having the notes of their interviews with Asylum
25 Officers  interferes with and impedes my preparation of those clients' cases for their presentation
26 in court and negatively impacts the representation that I provide.  This is especially so when
27 neither I nor another attorney represented the client when he or she appeared for the interview at
28 the Asylum Office.   In these circumstances, I do not have my own (or another attorney's) notes or

DAVIS WRIGHT TREMAINE LLP

1  memory on which I can rely to gauge how the client may have failed to communicate effectively
2  with the Asylum Officer or where there may have been a misunderstanding between the Officer
3  and the applicant or where poor word choice or a mistake by an interpreter may have had an
4  impact.  Even when I am present, however, my own notes are not a substitute for those taken by
5  the interviewing Officer.  I will know the questions asked and answers given, but I cannot always
6  know if the Officer has misunderstood, misheard, or mistakenly transcribed what has been said.

**The Affirmative Asylum Process and Role of the Notes Taken by Asylum Officers to Document Asylum Interviews**

9.  When an individual seeks the protection of asylum, the individual may apply "affirmatively" if he or she is not in removal proceedings.  To do so, the asylum seeker must complete and submit an application form, Form I-589, Application for Asylum and Withholding of Removal, along with a photograph and documents that establish the applicant's identity.  The applicant may also provide a declaration and other supporting or corroborating evidence, such as documentation of country conditions, medical and psychological records and evaluations, and declarations or letters from witnesses.  After the completed I-589 is submitted to the appropriate agency service center, the applicant receives a notice directing the person to appear at a designated office to be fingerprinted and photographed.  The applicant also receives a notice to appear for an interview by an Asylum Officer.  In the San Francisco Bay Area, these interviews are held at the San Francisco Asylum Office, which is located at 75 Hawthorne Street in San Francisco, California.

10.  An asylum applicant may appear for the interview on his or her own.  Alternatively, at his or her own expense, an applicant may be represented in applying for asylum, including at the interview before the Asylum Officer.  The applicant is also responsible for bringing an interpreter to the interview if one is needed.

11.  At the interview, the Asylum Officer reviews the application with the applicant and questions the applicant under oath.  As a general matter, questions are used to elicit information bearing on the applicant's eligibility for asylum.  Some questions are essentially the same from applicant to applicant, most commonly those that go to the mandatory bars to asylum,

DAVIS WRIGHT TREMAINE LLP

1  while other questions probe the particular facts underlying the individual applicant's claim for
2  asylum.  Interviews can be wide-ranging and cover a variety of topics.  Like any "conversation,"
3  these interviews are naturally prone to include miscommunications and misunderstandings of
4  information, but even more so at the Asylum Office because of the very stressful nature of the
5  interview.  Applicants are required to recall, in detail, the worst moments of their lives, for
6  someone who is a stranger and a government official.  Many asylum applicants have been
7  persecuted in the past by government officials.  In addition, Asylum Officers are required to test
8  each applicant's credibility, which may make some feel like they are not being believed during the
9  interview.  Asylum Officers are also required to be objective, which may appear as lacking
10 compassion when an asylum applicant may be describing a terrible experience, such as rape and
11 torture that they experienced.

12         12.     The perception that the applicant is not telling the truth is a leading reason why
13 an application may not be granted.  Certainly not every applicant is truthful, but in my experience,
14 a significant percentage of the time that an applicant is found not to be credible, the applicant has
15 been truthful, and there is a good explanation for the statement, facial expression, body language,
16 or other facet of the applicant's presentation that led an adjudicator to doubt the applicant.

17         13.     Asylum interviews are not recorded in any fashion.  The interviewing Asylum
18 Officer instead takes "notes" to document the interview as he or she is conducting it.  Most
19 commonly, the notes are typewritten on a computer, though some officers still handwrite their
20 notes.  The notes are recorded as the interview is in progress and are recorded by the interviewing
21 officer who normally is typing the questions and answers as the interview is being conducted.  If
22 present, an attorney for the applicant may also take notes and retain his or her own notes.
23 Attorneys are not allowed to use computers and can only handwrite their own notes.  An
24 interpreter may also take notes to help him or her provide accurate interpretation, but it is the
25 normal practice of the Asylum Office to confiscate interpreter notes at the end of the interview.
26 For unrepresented applicants, the Asylum Officer's contemporaneously taken notes form the *only*
27 record of the interview.

28         14.     In my experience, Asylum Officers' notes documenting the asylum interviews

are not perfect transcripts of the questions and answers given.  They often omit words that may not have been necessary to communicate to the reader what the question was, and they frequently use unexplained abbreviations.  Individual officers also have somewhat different styles and formats for their notes.  There can also be outright mistakes, as one would expect under the circumstances.  Though the notes are neither uniform nor 100% reliable for reasons like these, on the whole, the notes generally are very much like a transcript.  The notes are commonly written in a "Q&A" format similar to any deposition or record of sworn testimony.  They purport to convey the nature of the questions asked and answers given over the course of the interview.  They may include an occasional observation, such as that the applicant nodded or shook his head, but they do not include the Officer's analysis of the claim or recommendation.  I know this both from my own training and experience as an Asylum Officer and from the sets of asylum interview notes I have secured for clients' cases in the past.  Samples of such notes, with redactions to protect client identities, are attached hereto as Exhibits B, C, and D.  I secured the notes provided here as Exhibit B in response to a FOIA request made prior to the time when USCIS stopped providing the notes under FOIA.  The samples provided here as Exhibits C and D I received because the government introduced them in removal proceedings against my clients.

15. The notes taken by the interviewing Asylum Officer are included in the applicant's A-File and are among the documents available to the supervisor who reviews the interviewing Asylum Officer's assessment of the applicant's claim and the Officer's recommendation as to whether or not asylum should be granted.  In some cases, review by Asylum Headquarters in Washington, D.C., is needed, but in most cases, the Asylum Office issues a decision two weeks after the interview is completed.

16. When the agency's decision is not to grant asylum, an applicant who has valid immigration status receives a Notice of Intent to Deny (NOID).  The NOID is a relatively detailed letter that explains the Asylum Office's reasoning for denying the application. The applicant has an opportunity to respond to the NOID and sometimes succeeds in getting the Asylum Office to reverse its decision.

17. When the agency's decision is not to grant asylum and the applicant does not

1  otherwise have valid immigration status, the applicant is referred for removal proceedings before
2  the Immigration Court.  The applicant receives a Notice to Appear (NTA), which is the charging
3  document that institutes removal proceedings, and a Referral letter.  In contrast to a NOID, a
4  Referral letter provides only a very brief indication of the reasons behind the Asylum Office's
5  decision not to grant the application.  True and correct copies of three Referral letters, with
6  redactions needed to protect the confidentiality of clients' asylum applications, are attached hereto
7  as Exhibit E.  These Referral letters are for clients whose asylum interview notes I have sought
8  under FOIA in advance of their removal hearings to aid my preparation of their cases for court.
9  The lack of any factual detail in Referral letters is another reason why it is important for attorneys
10 like myself to have the Asylum Officer interview notes when representing asylum seekers who
11 have been referred for removal proceedings.  For example, the Referral letter may indicate that the
12 applicant was found not to be credible, but not the basis for that conclusion.  Or it may say that a
13 nexus between the harm and a protected ground has not been shown, but that too will often not tell
14 me enough for me to determine precisely which aspects of the record could and should be better
15 developed.  It may, for example, be the case that the conclusion flowed from the type of questions
16 the Officer asked.  I often am only able to make that determination if I have the interview notes
17 and can then focus my preparation of the case for Immigration Court on bringing forth the
18 information that the Asylum Officer may have missed or misunderstood.

19       18.      When I do not have the Asylum Officer interview notes, I will typically have to
20 spend additional time with clients, trying to help them remember portions of their interviews.  This
21 is challenging, time-consuming, and often not very productive because the stress and length of
22 asylum interviews is such that few applicants are able to remember important details, and the
23 passage of time following their interviews only diminishes their ability to recall the many
24 questions they were asked over the course of their often lengthy interviews.  Frequently my clients
25 do not remember details about the information they may have shared with the Asylum Officer, let
26 alone have any recall about how they may have expressed this information – which in turn, in my
27 experience, frequently leads to misunderstandings and misimpressions that materially affect how
28 Asylum Officers perceive and assess my clients' credibility as well as their eligibility for asylum.

DAVIS WRIGHT TREMAINE LLP

And even if they do recall what was said, they may not understand why a small detail from the interview is important and not tell me about it.

19. Without the Asylum Officer notes, I frequently am forced to engage in guesswork regarding what information to present to the Immigration Court on behalf of my clients. Sometimes the result is that I expend time and resources developing an aspect of the record that, unbeknownst to me, was not an issue for the Asylum Officer and was not in need of augmentation to be sufficient for the Immigration Court. Other times, I am completely unaware that aspects of the record require further development. Without the notes, it is common for me to only become aware of an issue *after* the client's merits hearing is underway. As a general matter, this deprives me and my clients of a full and fair opportunity to present each client's claim for asylum in the strongest possible manner. It also adds an unnecessary element of inefficiency and makes my job more difficult and stressful. It further adds to the fear and stress experienced by my clients who have often already experienced serious harm in their home countries and whose claims for protection hang in the balance.

20. The trial attorney (TA) prosecuting the removal proceedings for the government receives the A-File, including the Asylum Officer interview notes, and is able to review them in depth well in advance of the merits hearings for my clients. Although I have none of this information, the TA is able to factor the notes into his preparation for court, his examinations of witnesses, and the arguments he makes to the Immigration Judge. The TA may try to rely on the notes to try to show that some element of asylum eligibility is lacking. Or, where there is some perceived inconsistency, the TA will usually use the notes as part of an effort to impugn my client's credibility. Mostly commonly, the trial attorney does this during cross-examination, after I have already conducted my direct examination of my client and presented her case for protection. The TA typically will ask questions about the notes before providing them to the court or to me. Then, the notes are provided at the end of cross-examination. In other words, the information from the notes is introduced as evidence before I can even ask for a continuance to review the material. It is also not uncommon for TAs to ask many questions from the notes but then not submit them as evidence; in that situation, I may not see the notes at all.

DAVIS WRIGHT TREMAINE LLP

21.     At the point when the TA has used the notes against my client, a continuance is often needed to respond.  However, Immigration Judges frequently do not grant continuances in the middle of proceedings, and even if one is granted, there is often some harm caused that cannot be cured.

22.     Continuances are a poor solution for a number of reasons.  They result in delay and inefficiency and can exacerbate the feelings of stress that clients almost invariably experience in the process.  It can also leave a negative impression with the Judge if my client and I need time to respond to negative information, and it allows the government's attorneys the opportunity to argue that any explanation or later evidence should be discounted because it is only being proffered after the notes were revealed.  Furthermore, depending on the presiding Immigration Judge's docket and the other scheduling constraints, the delaying effect can be substantial, as the San Francisco Immigration Court has a serious backlog of cases.  For new cases, merits hearing dates are currently being set as far out as 2017, almost four years from now, and when hearings are continued, they may not be reset for more than a year at a time.

23.     The lapse in time can negatively affect witness's memories as well as the availability of other corroborating evidence.  For many asylum seekers, the delay also adds to the time they are without work authorization, making it very difficult for them to find work and survive.  And of even more critical importance to many, it extends the time they are separated from spouses and children who had to remain behind in the home country, often in precarious situations, and who cannot follow to join until asylum is granted and the asylee can then petition for them.

24.     In contrast, when I have the Asylum Officer interview notes, I can better prepare my clients and their cases for Court.  The hearings are more expeditious and fairer.  For example, a Somali woman I represented in Immigration Court (but not at the Asylum Office) was referred for removal proceedings based on lack of credibility.  The woman, who had been persecuted on account of being part of a minority clan, had spent some time in a refugee camp in Kenya prior to arriving in the United States and seeking asylum.  From my review of the Asylum Officer's interview notes, I was able to tell that the interviewing Asylum Officer did not believe the refugee

-10-

DAVIS WRIGHT TREMAINE LLP

camp existed. Refugee camps frequently only exist for short periods during the time of greatest need and then are shut down, and when that happens, it can become more difficult to locate the camp on-line. Armed with the knowledge that this was an issue for the Asylum Officer, I secured confirmation from the UNHCR that the camp had in fact existed. A grant of asylum by the Immigration Judge came quickly after I submitted this evidence.

25. In another case, the Asylum Office declined to grant asylum to a gay man from Georgia based on a change in country conditions – namely the election of a new president. I was able to secure the interview notes and found that the interviewing Asylum Officer had not asked the applicant questions about the presidential election or its potential impact on his claim for asylum. Seeing how this aspect of the record had not been developed by the Asylum Officer, I knew that I needed to provide the Immigration Court with evidence that conditions in Georgia had not changed in any fundamental way, and I knew to have the client be prepared to explain in his testimony why he was still in danger – that notwithstanding the change in presidents, the culture had not changed, and the police who had previously persecuted him continued to be a threat.

26. In another case, I represented a man from Uzbekistan man who faced persecution on account of his political opinion. He had been referred for proceedings based on his failure to meet the one-year filing deadline after the Asylum Office found that there was no exception to the bar to asylum for late filers. In reviewing the Asylum Officer notes of the interview, I found that the Officer had not asked any questions about the psychological impact of past persecution. The impact of trauma is known to cause many victims of persecution to delay seeking asylum. While difficult for an unrepresented layperson to understand and document, the impact of trauma has been recognized as a basis for an exception to the filing deadline. Because I had the notes in this case and, as a result, could see that this important area appeared not to have been explored or considered by the Asylum Officer, I knew that developing this area of the record could be critical. I had the client evaluated by an expert, who concluded that impact of trauma was a cause of the delay in this client's filing. We came to court prepared with this evaluation, and the Immigration Judge granted asylum.

27. An elderly woman from Kyrgystan sought asylum based on harassment she

suffered on account of her nationality.  The Asylum Office did not grant her application, and she too was referred for removal proceedings, based on the conclusion that she had not suffered past persecution and did not have a well-founded fear of persecution.  In reviewing the Asylum Officer's interview notes, I saw that the Officer had asked too few questions about the harm the woman had experienced.  At one point, the woman had been pushed off a bus.  The incident might not have constituted persecution in some cases, but asylum law can take into account age and similar circumstances.  Here, the woman had hurt her hand and suffered a broken toe in the fall, which developed into gangrene and resulted in the amputation of her toe.  Seeing that the Asylum Officer had not asked the kind of questions that would have drawn out this information and understanding the impact for the claim, I knew to bring in medical evidence and have my client testify about how she was hurt, and the result was that she received asylum.

28. In another of my cases, a gay man from Tajikistan had applied for asylum based on the mistreatment he had suffered at the hands police.  He was not politically active in gay rights groups and had been too young to go to clubs and the like, but he had nonetheless been targeted.  When he was asked at the Asylum Office if he was familiar with the gay community, he had said yes, thinking of his friends and others he knew.  He also said yes when asked if he was concerned about AIDS.  He was referred for proceedings because the Asylum Office perceived there to be inconsistencies in his testimony when he then could not identify a gay club or say where the AIDS center was in his city.  In this case, I did not get the asylum interview notes; it was only from the TA's cross-examination that I was able to understand what the challenge was to his credibility.  We had to ask for a continuance to get additional proof to explain the government's mistakes, including that while the client was not politically active, his claim was based on his sexual identity and not involvement in political groups, he did not go to bars to meet people, and the club in question – the sole "gay" club – was not "gay," but gay-tolerant, and had closed.  Asylum was granted, but only after stress and delay that could have been avoided if I had had the notes in advance of the hearing.

29. As these examples show, having the notes from clients' asylum interviews can make a critical difference.  My clients prevail and secure asylum without them in many cases, and

-12-
DECLARATION OF JEFFREY MARTINS IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
Case No. C 13-00591 LB

DWT 22031759v4 0200092-000002

even when I have had the notes in past cases, some clients' applications have not been granted. But the risk of error, the time, expense, inefficiency, and stress all increase when I, as the attorney for these individuals, am deprived of timely access to the asylum interview notes and the opportunity to use what I learn from them in my representation of my clients. And for applicants in fear for their lives and the safety of their families, the stakes are simply too high to have unnecessary impediments added to the process of presenting their claims for protection.

**Past and Recent Experience Requesting Asylum Interview Notes under FOIA**

30. I have been submitting FOIA requests for clients' A-Files for as long as I have had my legal practice. In the past, I frequently received the Asylum Officer interview notes when my clients' A-File contents were produced in response the FOIA requests I filed as part of my representation of my clients. A sample of these notes, which I secured through a FOIA request and have redacted to protect the client's identity, is attached hereto as Exhibit B.

31. Beginning in or around March 2012, I stopped receiving the Asylum Officer notes of my clients' asylum interviews on a consistent basis despite my having requested them in the same manner as I previously had, through a FOIA request for the A-File. For more than a year now, none of my FOIA requests for clients' A-Files has led to production of the notes taken during the clients' asylum interviews, though I have repeatedly appealed to the agency and specifically challenged the withholding of the asylum interview notes. After considerable investigation and inquiry, I know that the situation that I have encountered since March is not in any way unique to my practice. I know of no immigrant attorney who is now regularly obtaining access to Asylum Officer interview notes for any of their clients. The government is systematically no longer making this vital information available to immigrant lawyers who request them using the Freedom of Information Act.

32. However, during this time, the government has continued to rely on Asylum Officer interview notes and to introduce them in proceedings as evidence against my asylum-seeking clients.

**Cases for which I and my clients lack requested asylum interview notes despite upcoming hearings**

DAVIS WRIGHT TREMAINE LLP

33.   I have made numerous FOIA requests for the A-Files of clients in removal proceedings after they applied for asylum at the Asylum Office and were referred to the Immigration Court for removal proceedings.  Listed below are requests that I have made in recent months for the cases of clients who have renewed their applications for asylum in Immigration Court.  In the interest of protecting the confidentiality of my clients' asylum applications, I refer to them here by their initials while providing the agency control numbers that identify the FOIA requests for their respective A-Files.  The corresponding documentation of the ensuing agency response letters to my FOIA requests, my appeal letters, and the agency's responses to my appeals similarly are redacted to protect client identities.

34.   In response to all of the requests identified here, a substantial number of pages from the requested A-Files have been withheld, either partially or in their entirety.  The notes that the Asylum Officer took to document each client's interview were among the withheld pages.

35.   I appealed the withholding of responsive documents in all these cases and in all such appeals specifically challenged the withholding of the Asylum Officer interview notes.  The notes have not been released in response to any of the requests detailed here.

36.   All of these clients, with the exception of I.A. whose hearing was held on March 27, 2013, have their cases pending at the Immigration Court and are awaiting their individual merits hearings.  While the presiding Immigration Judge granted asylum to I.A., I continue to have a need for the notes from I.A.'s Asylum Office interview.

37.   On or about March 26, 2012, I submitted a FOIA request for the A-File of my client, N.S.  This request is identified as NRC2012026531.  In its response, USCIS indicated that it had identified 190 pages as responsive to the request.  On or about April 12, 2012, USCIS indicated it was releasing 58 pages in full and 57 pages in part to me, while withholding 54 pages in full.  USCIS further indicated that it was referring an additional 21 pages to another agency for it to respond directly to me.  On or about May 29, 2012, I appealed the determination to withhold material covered by the request, specifically challenging the withholding of the notes taken by the Asylum Officer at N.S.'s asylum interview.  On or about June 10, 2012, after receiving my appeal, USCIS indicated it was releasing an additional 52 pages, 15 in full and 37 in part, to me.

DAVIS WRIGHT TREMAINE LLP

However, with the exception of one page, which laid out questions and answers pertaining to the mandatory bars to asylum, the Asylum Officer's notes of N.S.'s interview were not among the pages released. I have not since received the withheld pages of Asylum Officer notes of N.S.'s interview. True and correct redacted copies of the agency's letter responding to my initial request for N.S.' A-File, my appeal letter, and the response to the appeal are attached hereto as Exhibit F. The merits hearing for N.S. is currently set for July 12, 2013.

38. On or about April 12, 2012, I submitted a FOIA request for the A-File of my client, A.A.G. This request is identified as NRC2012033089. In its response, USCIS indicated that it had identified 488 pages as responsive to the request. On or about May 29, 2012, USCIS indicated that it was releasing 242 pages in full and 17 pages in part to me. The agency's response indicated that 88 pages were withheld in their entirety and an additional 6 pages were referred to other agencies for those entities to respond directly to me. On or about June 19, 2012, I appealed the determination to withhold information covered by the initial FOIA request and specifically challenged the withholding of the notes that the Asylum Officer took during A.A.G.'s asylum interview. On or about July 23, 2012, after receiving the appeal, USCIS indicated it was releasing an additional 20 pages in part to me. However, Defendants have continued to withhold the Asylum Officer's notes of A.A.G.'s interview. True and correct redacted copies of the agency's letter responding to my initial request for A.A.G's A-File, my appeal letter, and the response to the appeal are attached hereto as Exhibit G. The merits hearing for A.A.G. is currently set for September 27, 2013.

39. On or about May 23, 2012, I submitted a FOIA request for the A-File of my client, C.S. This request is identified as NRC2012046553. On or about June 5, 2012, USCIS responded, indicating that it had identified 1,413 pages as responsive to the request. USCIS indicated that it was releasing 1,258 pages in full and 16 pages in part and withholding 99 pages in full. USCIS further indicated that it was referring an additional 21 pages to another agency for it to respond directly to me. On or about June 5, 2012, I appealed the determination to withhold responsive material, specifically challenging the withholding of the notes documenting the two Asylum Office interviews of C.S. On or about July 19, 2012, after receiving my appeal, USCIS

-15-

1  indicated it was releasing an additional 11 pages in part to me. However, Defendants have
2  continued to withhold the Asylum Officer notes of C.S.'s interviews. True and correct redacted
3  copies of the agency's letter responding to my initial request for C.S.'s A-File, my appeal letter,
4  and the response to the appeal are attached hereto as Exhibit H. The merits hearing for C.S. is
5  currently set for June 21, 2013.

6        40.      On or about May 1, 2012, I submitted a FOIA request for the A-File of my
7  client, T.L. This request is identified as NRC2012038580. On or about May 22, 2012, USCIS
8  informed me of the agency's determination to withhold 10 pages in part and 63 in full. On or
9  about June 5, 2012, I appealed the determination to withhold responsive material and included a
10 specific challenge to the withholding of the notes documenting T.L.'s interview at the Asylum
11 Office. On or about July 16, 2012, USCIS indicated it was releasing an additional 38 pages to me.
12 However, Defendants have continued to withhold the Asylum Officer notes of T.L.'s interview.
13 True and correct redacted copies of the agency's acknowledgement of receipt of my initial request
14 for T.L.'s A-File, my appeal letter, and the response to the appeal are attached hereto as Exhibit I.
15 The merits hearing for T.L. is currently set for November 19, 2014.

16       41.      On or about June 1, 2012, I submitted a FOIA request for the A-File of my
17 client, K.L. This request is identified as NRC2012049919. On or about June 12, 2012, USCIS
18 responded, stating that it had identified 171 responsive pages. USCIS indicated that it was
19 releasing 108 pages in full and 14 in part to me. On or about June 19, 2012, I appealed the
20 determination to withhold responsive material and included a specific challenge to the withholding
21 of the notes of my client's asylum interview. In response to my administrative appeal, on or about
22 July 19, 2012, USCIS indicated that it was releasing an additional 14 pages in part and 4 in full to
23 me. However, Defendants have continued to withhold the notes of K.L.'s asylum interview. True
24 and correct redacted copies of the agency's letter responding to my initial requests for K.L's A-
25 File, my appeal letter, and the response to the appeal are attached hereto as Exhibit J. The merits
26 hearing for K.L. is currently set for July 1, 2013.

27       42.      On or about June 15, 2012, I submitted a FOIA request for the A-File of my
28 client, E.E. This request is identified as NRC2012055907. On or about July 3, 2012, USCIS

DAVIS WRIGHT TREMAINE LLP

1 indicated that it had identified 200 responsive pages and was releasing 169 pages in full and 9 pages in part to me, while withholding 15 pages in full. USCIS also informed me that it was referring an additional 7 pages to other agencies for those entities to respond directly to me. On or about July 12, 2012, I appealed the determination to withhold responsive material and specifically challenged the withholding of the notes documenting the Asylum Office interview of E.E. On or about August 3, 2012, USCIS responded to my administrative appeal and indicated that it would release an additional 2 pages in part. Defendants have continued to withhold the Asylum Officer notes of E.E.'s interview. True and correct redacted copies of the agency's letter responding to my initial request for E.E.'s A-File, my appeal letter, and the response to the appeal are attached hereto as Exhibit K. The merits hearing for E.E is currently set for March 2, 2015.

43. On or about June 15, 2012, I submitted a FOIA request for the A-File of my client, S.S. This request is identified as NRC2012055854. On or about July 19, 2012, USCIS indicated that it had identified 177 responsive pages and was releasing 120 pages in full and 10 pages in part to me, while withholding 43 pages in full. USCIS also informed me that it was referring an additional 3 pages to another agency for it to respond directly to me. On or about August 24, 2012, I appealed the determination to withhold responsive material. In particular, I challenged the withholding of the notes documenting the Asylum Office interview of S.S. On or about October 1, 2012, USCIS responded to my administrative appeal and indicated that it would release an additional 33 pages in part and one in full. Defendants have continued to withhold the Asylum Officer notes of S.S.'s interview. True and correct redacted copies of the agency's letter responding to my initial request for S.S.'s A-File, my appeal letter, and the response to the appeal are attached hereto as Exhibit L. The merits hearing for S.S. is currently set for September 30, 2013.

44. On or about January 19, 2012, I submitted a FOIA request for the A-File of my client, Y.L. This request is identified as NRC2012003177. On or about July 3, 2012, USCIS indicated it had identified 231 responsive pages and was releasing 123 pages in full and 9 pages in part to me, while withholding 80 pages in full. USCIS indicated that it was referring an additional 14 pages to other agencies for their direct response to me. On or about July 16, 2012, I

1  appealed the determination to withhold responsive material and included a specific challenge to

2  the withholding of the notes of Y.L.'s asylum interview.  In response to my administrative appeal,

3  on or about August 7, 2012, USCIS released an additional 40 pages in part and one in full.

4  However, Defendants have continued to withhold the notes of Y.L.'s interview.  True and correct

5  redacted copies of the agency's letter responding to my initial request for Y.L.'s A-File, my appeal

6  letter, and the response to the appeal are attached hereto as Exhibit M.  The merits hearing for Y.L.

7  is currently set for July 17, 2014.

8      45.    On or about July 27, 2012, I submitted a FOIA request for the A-File of my

9  client, I.A.  This request is identified as NRC2012069832.  On or about August 15, 2012, USCIS

10 responded and indicated it would withhold 27 responsive pages in full and 9 such pages in part.

11 On or about August 21, 2012, I appealed the determination to withhold responsive material and

12 included a specific challenge to the withholding of the notes of I.A.'s interview.  In response to

13 my administrative appeal, on or about September 27, 2012, USCIS indicated it was releasing an

14 additional 2 pages in part.  Defendants have continued to withhold the notes of I.A.'s interview.

15 True and correct redacted copies of the agency's acknowledgement of receipt of my initial request

16 for I.A.'s A-File, my appeal letter, and the response to the appeal are attached hereto as Exhibit N.

17 The merits hearing for I.A. was held on March 27, 2013.  Asylum was granted, but I nonetheless

18 continue to have a need for the notes from his interview, as they may bear on future representation

19 that I may provide.

20     46.    On or about November 1, 2012, I submitted a FOIA request for the A-File of my

21 client, M.A.  This request is identified as NRC2012099752.  USCIS's response indicated that it

22 had identified 195 pages as responsive to the request.  USCIS agreed to release 152 pages in full

23 and 9 pages in part to me, while indicating it was withholding 24 pages in full.  On or about

24 December 17, 2012, I appealed the determination to withhold responsive material and included a

25 specific challenge to the withholding of the notes of M.A.'s interview at the Asylum Office.  On

26 or about December 26, 2012, USCIS acknowledged receipt of the administrative appeal and

27 assigned control number APP2012001489 to the appeal.  To date, I have not received any further

28 response to the administrative appeal, and Defendants have continued to withhold the Asylum

DAVIS WRIGHT TREMAINE LLP

1  Officer notes of M.A.'s asylum interview.  True and correct redacted copies of the agency's letter
2  responding to my initial request for M.A.'s A-File, my appeal letter, and the agency's
3  acknowledgement of receipt of my appeal are attached hereto as Exhibit O.  The merits hearing for
4  M.A. is currently set for November 16, 2013.

5      47.     In addition to filing administrative appeals of the withholding of responsive
6  documents and specifically challenging the withholding of the Asylum Officer interview notes, I
7  was offered and pursued the option of assistance from the Office of Government Information
8  Services (OGIS) in resolving the dispute over whether the Asylum Officer notes documenting the
9  asylum interviews were properly withheld.  I provided OGIS with five examples of FOIA requests
10 – those made for the A-Files of N.S., C.S., A.A., N.S., and Y.L. – that were met with a denial of
11 production of the Asylum Officer interview notes.

12     48.     My effort to secure production of the notes of my clients' interviews through the
13 assistance of OGIS was not successful.  USCIS did not change its position – it merely provided
14 some additional information about its theory for withholding the records I had requested.  In its
15 September 26, 2012 letter to me closing the matter, OGIS explained that it had consulted USCIS
16 FOIA Public Liaison Jill Eggleston and counsel for USCIS, Alan Hughes, who reviewed the
17 records at issue and affirmed the agency's decision to withhold the records.

18     49.     Following the OGIS's final communication with me, in letters addressing
19 administrative appeals by me for A-File FOIA requests that were not among the examples given to
20 the OGIS, USCIS specifically communicated the basis it claims for withholding Asylum Officer
21 interview notes.  In the agency's September 27, 2012 letter responding to my administrative
22 appeal of the withholding of responsive records, including the asylum interview notes from the A-
23 File of my client I.A., Mr. Hughes of USCIS informed me of the agency's position that asylum
24 interview notes "are appropriately withheld pursuant to 5 U.S.C. § 552(b)(5)."  A true and correct
25 redacted copy of this letter is attached hereto as Exhibit N.  Through Mr. Hughes, USCIS
26 reiterated this position in the agency's October 1, 2012 letter responding to my administrative
27 appeal of the withholding of responsive records including the asylum interview notes from the A-
28 File of my client S.S.  A true and correct redacted copy of this letter is attached hereto as Exhibit

DAVIS WRIGHT TREMAINE LLP

L.

50.     Despite the consistency with which I have experienced having the notes of my clients' asylum interviews withheld, I continue, and will continue, to request clients' A-Files. Since filing this lawsuit, I have submitted approximately 15 FOIA requests for asylum-seeking clients.

51.     In my view, it is inherently unfair in any judicial proceeding for there to be such an imbalance of information, particularly here, where individuals' lives and the safety of applicants' families are on the line.  In all criminal and civil proceedings, attorneys are required to comply with discovery rules, so that the clash of competing arguments will ensure justice.  While there is no discovery in administrative proceedings at the Immigration Court, it is grossly unfair for one side to have such an advantage.  The trial attorneys for the government already have a large amount of information not available to asylum-seekers requesting protection.  I believe that having the balance tipped even further toward the government violates the very notion of fairness and due process, and it further endangers the lives of *bona fide* refugees, a very fragile population.

52.     For the reasons outlined above, I continue to have a substantial need for the requested asylum interview notes, because my clients have need for the fullest, most effective representation possible, which is impeded when I lack the notes.  Delay in the production of the notes is also harmful, as the passage of time can affect the availability of evidence that I may not know is needed until it is too late.

I hereby declare under penalty of perjury, pursuant to the laws of the United States of America, that this declaration was executed on May 29, 2013 at San Francisco, California, and that the foregoing is true and correct to the best of my knowledge.

                                          */s/ Jeffrey Martins*
                                          Jeffrey Martins